Christopher J. FEELEY, AK–Feel, LLC, a Delaware limited liability company, and Oculus Capital Group, LLC, a Delaware limited liability company, Plaintiffs,

v.

NHAOCG, LLC, a New York limited liability company, Andrea Akel, George Akel, David Newman, and Daniel Hughes, Defendants.

C.A. No. 7304–VCL.

Court of Chancery of Delaware.

Submitted: Sept. 26, 2012.
Decided: Nov. 28, 2012.

Michael P. Kelly, Andrew S. Dupre, McCarter & English, LLP, Wilmington, Delaware; Attorneys for Plaintiffs.

Jason C. Jowers, Brett M. McCartney, Morris James LLP, Wilmington, Delaware; Jeanette N. Simone, Albert J. Millus, Jr., Hinman, Howard & Kattell, LLP, Binghamton, New York; Attorneys for Defendants NHAOCG, LLC, George Akel, David Newman, and Daniel Hughes.

Michael W. McDermott, David B. Anthony, Berger Harris, LLC, Wilmington, Delaware; Thomas A. Riley, Jr., Riley

Riper Hollin & Colagreco, Exton, Pennsylvania; Attorneys for Defendant Andrea Akel.

## OPINION

LASTER, Vice Chancellor.

This case began as a control dispute in which the managing member of Oculus Capital Group, LLC ("Oculus," "OCG," or the "Company") sought to block the non-managing member from attempting to take over the managerial role. After a stipulated order and assorted rulings, the control dispute has largely been resolved. What remains are the non-managing member's counterclaims, which seek damages from the managing member and its human controller based on the actions they took that caused the relationship between the parties to deteriorate and led to the control dispute. The plaintiffs have moved to dismiss the counterclaims. Their motion is partially granted.

## I. FACTUAL BACKGROUND

The facts for purposes of the motions are drawn from the counterclaims (cited as "CC") and the documents they incorporate by reference. All reasonable inferences are drawn in favor of the non-movant.

### A. A New Business Relationship

Before the events giving rise to this litigation, plaintiff Christopher J. Feeley and defendant Andrea Akel worked for NorthMarq Capital Group, Inc., where they identified and structured real estate transactions. In late 2009, Feeley and Akel wanted to strike out on their own, but they needed financing for their business. When other sources proved unavailable, Akel turned to her father, defendant George Akel, who is a successful real estate developer. George Akel had invested in other real estate projects with defendant David Newman, who joined the discussions. Newman in turn brought in defendant David Hughes, with whom Newman had invested in the past.

George Akel, Newman, and Hughes liked the idea of backing George's daughter, but they were "not previously acquainted with Feeley" and "were concerned about going into business with an untested stranger." CC ¶ 190. "Eventually, however, Feeley sold himself to Mr. Akel, Mr. Newman, and Mr. Hughes by convincing them that he was extremely well connected in the world of financing and that he had an extensive 'book of business' that he would be able to employ to seek out and secure sources of equity and debt financing." *Id.* According to the counterclaims, George Akel, Newman, and Hughes nevertheless "were unwilling to commit to a long-term relationship in untested waters." *Id.* ¶ 191. They allegedly insisted "that the relationship would be an experiment" and "that the entity formed by Mr. Akel, Mr. Newman, and Mr. Hughes ... would be able to end after two years if they were not satisfied with the outcome." *Id.* As will be seen, the plain language of the relevant agreements does not impose a two-year time limit on the venture or give the entity formed by George Akel, Newman, and Hughes a termination right.

### B. The Parties Form Oculus.

In January 2010, the parties formed Oculus as a Delaware limited liability company. The two members of Oculus are plaintiff AK–Feel, LLC ("AK–Feel" or "AFE"), a Delaware limited liability company, and defendant and counterclaim plaintiff NHAOCG, LLC ("NHA"), a New York limited liability company. AK–Feel's two members are Feeley and Andrea Akel. NHA's three members are entities affiliated with Newman, Hughes, and George Akel. AK–Feel and NHA each hold a 50%

member interest in Oculus, but AK–Feel serves as the managing member. *See* Compl. Ex. A § 4.1(a) (the "Operating Agreement" or "OA"). As managing member, AK–Feel generally has authority to run the day-to-day business of Oculus, subject to NHA having approval rights over certain major decisions. *See id.* § 4.1(b).

Feeley serves as the managing member of AK–Feel. In that capacity, he controls the activities of both AK–Feel and Oculus. In addition, Feeley serves as the President and CEO of Oculus pursuant to the terms of an employment agreement. *See* Compl. Ex. C (the "Employment Agreement" or "EA"). The Employment Agreement mandates that any disputes arising under or relating to its terms be referred to arbitration. *Id.* § 9.

### C. The Parties' Relationship Sours.

NHA alleges that "Feeley failed miserably" in his managerial roles at Oculus and that his "vaunted 'book of business' and his supposed acumen as a financier proved to be illusory." CC ¶¶ 209–10. According to NHA, "Feeley identified few projects over the two-year period, and one of the only ones he arguably 'found'—The Gatherings project in Florida—ended in disaster due to Feeley's gross negligence." *Id.* ¶ 210. NHA asserts that after the failed Gatherings project, Feeley began "negotiating student housing deals for his own account" instead of presenting them to NHA for consideration by Oculus. *Id.* ¶ 225.

The Gatherings project fell through in November 2011. Oculus had signed a contract to acquire the property during the summer which called for Oculus to tender a deposit payment in a specific amount and stated that time was of the essence. Feeley tendered less than what the contract specified. The seller declared a default and cancelled the contract. Oculus forfeit-ed a portion of its deposit, became obligated to reimburse a co-investor for its investment, suffered financing penalties, and lost the fees that would have been earned had the deal closed. *See id.* ¶¶ 221–22. Feeley has offered to make NHA whole for its losses, but NHA regards that as an empty promise. *See id.* ¶ 223.

### D. The Delaware Litigation

Dissatisfied with Feeley in general and angry about the Gatherings debacle, the principals of NHA decided to end their business relationship with Feeley and attempted to take over Oculus. On March 5, 2012, Feeley and AK–Feel filed this litigation, in which they sought to block NHA's attempt and establish their continuing control. On March 23, the parties entered into a stipulation resolving the near-term control issues and mooting the need for an expedited trial. Dkt. 57.

After settlement discussions failed, the plaintiffs filed an amended complaint, which NHA answered. The plaintiffs moved for judgment on the pleadings on certain of their claims, and that motion was largely granted. *See Feeley v. NHAOCG, LLC,* 2012 WL 4859157 (Del. Ch. Oct. 12, 2012). Between the March 23 stipulation and the partial judgment on the pleadings, the control dispute that sparked this litigation has been resolved.

What remains are NHA's counterclaims, through which NHA seeks to recover damages from AK–Feel and Feeley for the failed Gatherings transaction, Feeley's alleged diversions of real estate opportunities, and other events that caused the parties' relationship to fracture. NHA also seeks to enforce its claimed right to end the Oculus venture after two years. AK–Feel and Feeley have moved to dismiss the counterclaims.

## II. LEGAL ANALYSIS

■ When considering a motion to dismiss, all well-pled factual allegations in the counterclaims must be accepted as true and all reasonable inferences drawn in favor of the non-movants. *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC,* 27 A.3d 531, 536 (Del. 2011). A pleading only can be dismissed if it fails to state a claim on which relief can be granted under this liberal pleading standard. *See id.;* Ch. Ct. R. 12(b)(6).

NHA organizes its counterclaims into five counts. Count I contends that AK–Feel breached the Operating Agreement by acting in a grossly negligent manner or engaging in willful misconduct in connection with the Gatherings transaction, by diverting investment opportunities that should have been passed along to Oculus, and by failing to perform a list of other "obligations pursuant to the OCG Operating Agreement." CC ¶ 245. Count II alleges that Feeley aided and abetted the breaches of the Operating Agreement outlined in Count I. Count III alleges that both AK–Feel and Feeley owe "default fiduciary duties" to NHA, which they breached by engaging in the acts described in Count I. *Id.* ¶¶ 253, 255. Count IV is styled as a separate claim for negligence. Count V seeks a declaratory judgment that NHA has the right to cause Oculus to "cease ... business operations," which NHA defines as "the search for business and financing opportunities." *Id.* ¶ 269. NHA believes that Oculus would and, despite ostensibly "ceasing business operations" could, continue as a passive investor in its existing projects, receive distributions from those projects, and pass them along to NHA and AK–Feel.

### A. Arbitration

As a threshold matter, Feeley argues that any counterclaims against him necessarily arise out of actions he took as President and CEO of Oculus, relate to his Employment Agreement, and therefore must be arbitrated. Feeley is partially correct.

Section 9 of the Employment Agreement states:

> Any controversy, dispute or claim arising out of or relating to this Agreement or the breach hereof which cannot be settled by mutual agreement ... shall be finally settled by arbitration as follows: Any party who is aggrieved shall deliver a notice to the other party setting forth the specific points in dispute. Any points remaining in dispute twenty (20) days after the giving of such notice shall be submitted to arbitration in Philadelphia, Pennsylvania, to the American Arbitration Association [sic] Association's Arbitration Rules....

EA § 9. Section 9 confers the authority to decide substantive arbitrability on the arbitrators, so if there is a non-frivolous reason to think that the claims against Feeley could be arbitrable, the arbitrators must be allowed to decide the question of substantive arbitrability before this case proceeds any further. *See GTSI Corp. v. Eyak Tech., LLC,* 10 A.3d 1116, 1121 (Del. Ch.2010).

■ Delaware public policy favors arbitration. *SBC Interactive, Inc. v. Corporate Media P'rs,* 714 A.2d 758, 761 (Del. 1998). "A strong presumption exists in favor of arbitration, and, accordingly, contractual arbitration clauses are generally interpreted broadly by the courts." *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC,* 922 A.2d 417, 430 (Del.Ch. 2007). This presumption, however, "will not trump basic principles of contract interpretation." *Id.* A party "cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *James & Jackson, LLC v. Willie Gary,*

*LLC,* 906 A.2d 76, 78 (Del.2006) (internal quotation marks omitted). A court should not compel a party to arbitrate a cause of action independent of the agreement containing the arbitration provision. A cause of action is independent of an agreement if does not "touch on contract rights or contract performance" under that agreement. *Parfi Hldg. AB v. Mirror Image Internet, Inc.,* 817 A.2d 149, 155 (Del.2002). Put differently, a cause of action is independent if it "could [have been] brought had the parties not signed" the contract containing the arbitration clause. *Id.* at 156 n. 24. Consistent with *Parfi,* this Court has not required arbitration of causes of action that were "not to any degree intertwined" with the contract containing the arbitration clause, *NAMA,* 922 A.2d at 434, or where the party could plead its affirmative claim "without ever mentioning" the contract containing the arbitration clause, *Majkowski v. American Imaging Management Services LLC,* 913 A.2d 572, 583 (Del.Ch.2006).

■ NHA's claims against Feeley require careful parsing. The Employment Agreement gives rise to and governs Feeley's service in his capacities as President and CEO of Oculus, and a claim for breach of the fiduciary duties owed by Feeley in those capacities is therefore subject to arbitration. *See Elf Atochem N. Am. v. Jaffari,* 727 A.2d 286, 293–94 (Del.1999) (requiring arbitration of claims for breach of fiduciary duty by manager when LLC agreement giving rise to manager's status and duties contained mandatory arbitration clause). In *Parfi,* however, the Delaware Supreme Court held that this Court erred by sending breach of fiduciary duty claims to arbitration when the arbitration provision appeared in a distribution agreement that neither gave rise to nor governed the defendants' status as fiduciaries and when the claims could be asserted

independent of the distribution agreement. 817 A.2d at 156–57. The Supreme Court recognized that the breach of fiduciary duty claims "arise from some or all of the same facts" that provided the basis for arbitrable breach of contract claims, but held that the common factual underpinnings did not warrant arbitration. *Id.* at 157. "[P]urportedly independent actions do not touch matters implicated in a contract if the independent cause of action could be brought had the parties not signed a contract." *Id.* at 156 n. 24. Under *Parfi,* claims that could be pled against Feeley without implicating his Employment Agreement need not be referred to arbitration.

■ Count II asserts a cause of action against Feeley for aiding and abetting any breach by AK–Feel, and Count IV asserts a cause of action for breach of duty against Feeley in his capacity as the managing member of AK–Feel. Both causes of action would exist and could be brought even if Feeley had never signed the Employment Agreement. NHA could have and has pled its causes of action without ever mentioning the Employment Agreement. Those claims against Feeley are therefore not subject to arbitration.

Count III, however, alleges that "plaintiff Feeley, in his role as actual manager of OCG, also owes default fiduciaries to NHA" and contends that Feeley breached those duties. CC ¶¶ 253–54. There is a non-frivolous argument that by suing Feeley for breaches of duty "in his role as actual manager of OCG," NHA has sued Feeley for breach of his duties as President and CEO of Oculus, a claim that arises out of his Employment Agreement. Count III therefore must be stayed as to Feeley pending the outcome of a decision by the arbitrators on the issue of substantive arbitrability and, if the arbitrators

conclude that they have jurisdiction, the outcome of the arbitration.

## B. Count I: Breach Of Contract

In Count I, NHA contends that AK–Feel breached its contractual obligations under the Oculus Operating Agreement. The count has three subsections. In the first subsection, NHA alleges that AK–Feel was grossly negligent in failing to complete the Gatherings transaction. *See* CC ¶¶ 239–41. AK–Feel has answered this aspect of Count I, so it is not at issue on the motion to dismiss. AK–Feel has moved to dismiss the other two subsections of Count I. With one exception, this aspect of the motion to dismiss is granted.

█ In the second subsection of Count I, NHA alleges that AK–Feel engaged in "self-dealing" by usurping opportunities that belonged to Oculus. *See id.* ¶¶ 242–44. AK–Feel responds that it could not have violated a contractual restriction on taking opportunities because it had no contractual obligation to present opportunities to Oculus. Dkt. 187 at 21 n. 6. As a matter of contract (although not as a matter of fiduciary duty), AK–Feel is correct. Only NHA undertook a contractual obligation to present opportunities to Oculus.

In Section 3.8(d) of the Operating Agreement, NHA agreed that "[f]or so long as Christopher J. Feeley is employed by the Company, NHA and its members shall refer to the Company any investment opportunity in multifamily housing or student housing identified by or presented to NHA or its members...." OA § 3.8(d). AK–Feel did not agree to a parallel obligation. Instead, AK–Feel agreed that it would not pursue any business interests whatsoever except investment opportunities that NHA did not approve for Oculus. Section 4.4 of the Operating Agreement states:

> Subject to its right to pursue investment opportunities as provided below, AFE, in its role as Managing Member, shall be required to manage the Company as its sole and exclusive function *and it may not have other business interests or engage in other activities in addition to those relating to the Company.* In the event NHA declines to participate in an investment opportunity of the Company, AFE shall have the right to pursue such investment opportunity on its own behalf, independent of the Company or NHA, and the Company shall not have any ownership interest or other involvement with such opportunity.

*Id.* § 4.4 (emphasis added). For opportunities that NHA declines and AK–Feel pursues independently, Oculus remains entitled to "earn the appropriate fees" upon closing "if the Company, AFE or the member [sic] of AFE participate in the origination and sourcing of the capital or debt for such investment." *Id.* AK–Feel did not agree to present business opportunities to Oculus. Instead it agreed that the only business AK–Feel would conduct would be managing Oculus or pursuing business opportunities that NHA turned down.

Count I does not allege that AK–Feel is engaged in activities other than managing Oculus or owns other business interests. Count I only pleads that Feeley has developed investment opportunities through entities other than AK–Feel and Oculus. As discussed below, these allegations plead a claim for breach of the fiduciary duty of loyalty, but they do not plead a claim for breach of Section 4.4. This subsection of Count I is therefore dismissed.

In the third subsection of Count I, NHA lists five additional contractual defaults that allegedly have occurred. The following quotation comprises the sum total of the allegations in the counterclaims about these additional defaults:

By Stipulation so-ordered by the Court on March 26, 2010, defendants, among other things, acknowledged that AFE had been and remained Managing Member of OCG, and reinstated plaintiff Feeley as OCG's employee with back pay. Since that time, AFE has failed to perform its obligations pursuant to the OCG Operating Agreement in that AFE:

a) Has failed to seek out and present investment and financing opportunities to AFE.

b) Upon information and belief, has sought out such opportunities on its own behalf or on behalf of plaintiff Feeley.

c) Has failed to provide timely and complete information to NHA in response to NHA's reasonable requests.

d) Has failed to submit a budget for OCG's operations during 2012.

e) Has otherwise failed to provide sound management as required by the OCG operating Agreement.

CC ¶ 246.

The allegation in subparagraph (d) that Feeley has failed to submit a budget for 2012 is clear, presumed true on a motion to dismiss, and states a claim. The other allegations of paragraph 246 do not state a claim. Subparagraphs (a) and (b) repeat the allegations about diverting opportunities, are duplicative of the second subsection of Count I, and already have been addressed. Subparagraphs (c) and (e) are conclusory in the extreme and unsupported by any pled facts. As to these four alleged defaults, Count I is dismissed. Count I survives only as to the allegation in paragraph 246(d) and the first subsection, which AK–Feel chose to answer.

## C. Count II: Aiding and Abetting The Breaches Of The Operating Agreement

■■■ In Count II, NHA contends that Feeley "aided and abetted plaintiff AFE in its breaches of contract as set forth in Count I of these counterclaims." CC ¶ 249. " 'The elements of a claim for aiding and abetting a breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in [the] breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.' " *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del.2002) (quoting *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del.Ch. Mar. 25, 1999)).

■■■ When dealing with commercial contracts rather than entity agreements, Delaware law does not recognize the concept of aiding and abetting a breach of contract. *See Gotham P'rs, L.P.*, 817 A.2d at 172. In *Gotham Partners*, however, the Delaware Supreme Court held that two individuals and a corporation who were not parties to a limited partnership agreement but who controlled the corporate general partner could be held responsible for aiding and abetting a breach of the contractual duties imposed by the limited partnership agreement on the corporate general partner. *See id.* The corporate general partner was a wholly owned subsidiary of Hallwood Group Incorporated ("HGI"). Two officers of HGI, Anthony Gumbiner and William Guzzetti, served on the board of directors of the corporate general partner. *See id.* at 164. Chancellor Strine, then Vice Chancellor, held that the corporate general partner breached a contractual duty imposed by the limited partnership agreement to act fairly towards the partnership and its limited partners, which he found was substantially equivalent to the fiduciary duty standard that otherwise would apply to an interested transaction.

*See id.* at 168–69. The Chancellor held, and the Delaware Supreme Court agreed, that HGI, Gumbiner, and Guzzetti were liable on a theory of aiding and abetting: "[W]here a corporate General Partner fails to comply with a contractual standard [of fiduciary duty] that supplants traditional fiduciary duties, and the General Partner's failure is caused by its directors and controlling stockholder, the directors and controlling stockholder remain liable." *Id.* at 173 (internal quotation marks omitted; second alteration in original); *see also Fitzgerald,* 1999 WL 182573, at *1–2 ("To hold that there is no claim for aiding and abetting the breach of a fiduciary duty created by a contract pursuant ... would deprive a partnership and its partners of claims against those who encourage or otherwise collaborate with a partner which breaches fiduciary duties for which all partners contracted.").

AK–Feel and Feeley do not dispute that the first subsection of Count I pleads a claim that AK–Feel breached the Operating Agreement by acting in a grossly negligent manner or engaging in willful misconduct in connection with the Gatherings transaction. Candidly, I cannot find any contractual obligation in the Operating Agreement that would require AK–Feel to exercise due care or abjure intentional wrongdoing. The Operating Agreement appears to accept that those obligations exist as fiduciary default rules independent of the Operating Agreement, and then excludes violations of those duties from the scope of the Operating Agreement's exculpatory provision. Nevertheless, because AK–Feel and Feeley have not challenged this aspect of Count I, I will assume for purposes of the aiding and abetting count that the Operating Agreement in fact imposes contractual obligations of this kind.

Given that assumption, Count II pleads a *Gotham Partners*·claim against Feeley for aiding and abetting a breach of contract (odd as that sounds) to the same extent that a claim was pled in Count I. As the managing member and sole decision-maker of AK–Feel, Feeley made the challenged decisions and carried them out on behalf of AK–Feel. He therefore participated knowingly in the contractual breaches of duty. *See, e.g., Triton Const. Co. v. E. Shore Elec. Servs.,* 2009 WL 1387115, *16 (Del.Ch. May 18, 2009) (equating knowledge of entity and controlling person for purposes of aiding and abetting); *Teachers' Ret. Sys. of La. v. Aidinoff,* 900 A.2d 654, 671 (Del.Ch.2006) (same). The motion to dismiss Count II is denied.

## D. Count III: Breach Of Default Fiduciary Duty

In Count III of the Counterclaims, NHA contends that AK–Feel breached the "default fiduciary duties" it owed as managing member of Oculus and that Feeley breached the "default fiduciary duties" he owed as the "actual manager" of Oculus. CC ¶ 253. The latter claim has been stayed pending arbitration. *See* Part II.A, *supra.* The allegations against AK–Feel state a claim.

### 1. Default Fiduciary Duties Apply.

■ To defeat Count III, AK–Feel argues strenuously that LLCs are creatures of contract and that the managing member of an LLC owes only the duties explicitly stated in the operating agreement. AK–Feel also asserts that because NHA pled a claim for breach of contractual duties in Count I, and because AK–Feel answered a portion of that claim, NHA has conceded that only contractual duties exist.

■ NHA did not make a procedural concession; NHA pled in the alternative. "There is no doubt that alternative pleading, if clearly set forth as such, is permissible." *Halliburton Co. v. Highlands Ins.*

*Group, Inc.*, 811 A.2d 277, 280 (Del.2002); *see* Ch. Ct. R. 8(e)(2) (authorizing pleading in the alternative). NHA squarely contends that as a matter of Delaware law, AK–Feel owes default fiduciary duties as the managing member of Oculus, unless the Operating Agreement plainly restricts or eliminates them, and that AK–Feel breached its fiduciary duties.

Numerous Court of Chancery decisions hold that the managers of an LLC owe fiduciary duties.[1] Most recently, in *Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d 839 (Del.Ch.2012), *aff'd sub nom. Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 2012 WL 5425227 (Del.2012), Chancellor Strine explained why the managers of an LLC owe default fiduciary duties unless those duties are eliminated, restricted, or otherwise displaced by express language in the LLC operating agreement. On appeal, in af-firming the Chancellor's decision on the merits, the Delaware Supreme Court made clear that the comments about default fiduciary duties were "dictum without any precedential value." *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1218, 2012 WL 5425227, at *9 (Del.2012). The high court did not rule on whether the managers of an LLC owe default fiduciary duties. *Id.* at 1218–19.

As the Delaware Supreme Court recognized in *Gatz*, the long line of Chancery precedents holding that default fiduciary duties apply to the managers of an LLC are not binding on the Supreme Court, but are appropriately viewed as *stare decisis* by this Court. *Gatz*, 59 A.3d at 1218–19. Although the Delaware Supreme Court determined that the Chancellor should not have reached the question of default fiduciary duties, his explanation of the ratio-

1. *See Phillips v. Hove*, 2011 WL 4404034, at *24 (Del.Ch. Sept. 22, 2011) ("Unless limited or eliminated in the entity's operating agreement, the member-managers of a Delaware limited liability company[ ] owe traditional fiduciary duties to the LLC and its members."); *In re Atlas Energy Res. LLC*, 2010 WL 4273122, at *6 (Del.Ch. Oct. 28, 2010) ("in the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors ... apply in the [LLC] context."); *Kelly v. Blum*, 2010 WL 629850, at *10 (Del.Ch. Feb. 24, 2010) ("Delaware cases interpreting Section 18–1101(c) have concluded that, despite the wide latitude of freedom of contract afforded to contracting parties in the LLC context, 'in the absence of a contrary provision in the LLC agreement,' LLC managers and members owe 'traditional fiduciary duties of loyalty and care' to each other and to the company." (internal quotation marks omitted)); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8 (Del.Ch. Apr. 20, 2009) ("[I]n the absence of a contrary provision in the LLC agreement, the manager of an LLC owes the traditional fiduciary duties of loyalty and care to the members of the LLC."); *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch.2006) ("Delaware's Limited Liability Company and Limited Partnership Acts permit the contracting parties to expand or restrict ... fiduciary duties.... As a result, in the alternative entity context, it is frequently impossible to decide fiduciary duty claims without close examination of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship." (footnote and internal quotation marks omitted)); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 153 (Del. Ch.2004) ("In addition to any contractual duties owed by Fidelity Brazil and its managers, the managers owed a fiduciary duty of loyalty and care to Fidelity Brazil."); *VGS, Inc. v. Castiel*, 2000 WL 1277372, at *4–5 (Del.Ch. Aug. 31, 2000) ("Sahagen and Quinn each owed a duty of loyalty to the LLC, its investors and Castiel, their fellow manager."), *aff'd*, 781 A.2d 696 (Del.2001); *see also Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1476663, at *10 (Del.Ch. Sept. 27, 2000) ("Absent a contrary provision in the partnership agreement, the general partner of a Delaware limited partnership owes the traditional fiduciary duties of loyalty and care to the Partnership and its partners."), *rev'd in part*, 817 A.2d 160 (Del.2002).

nale for imposing default fiduciary duties remains persuasive, at least to me. In citing the Chancellor's discussion I do not treat it as precedential, but rather afford his views the same weight as a law review article, a form of authority the Delaware Supreme Court often cites. *See, e.g., id.* at 1220 n. 73, 1222 n. 89.

■■■■■ For reasons that were explained at greater length by the Chancellor, the Delaware Limited Liability Company Act (the "LLC Act") contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware LLC. Section 18–1104 states that "[i]n any case not provided for in this chapter, the rules of law and equity ... shall govern." 6 *Del. C.* § 18–1104. Like the Delaware General Corporation Law, the LLC Act does not explicitly provide for fiduciary duties of loyalty or care; consequently, the traditional rules of law and equity govern. *See Auriga,* 40 A.3d at 849–56. "A fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interests of another." *Metro Ambulance, Inc. v. E. Med. Billing, Inc.,* 1995 WL 409015, at *2 (Del.Ch. July 5, 1995) (quoting *Cheese Shop Int'l, Inc. v. Steele,* 303 A.2d 689, 690 (Del.Ch.1973), *rev'd on other grounds* 311 A.2d 870 (Del.1973)). The managing member of an LLC "is vested with discretionary power to manage the business of the LLC" and "easily fits the definition of a fiduciary." *Auriga,* 40 A.3d at 850–51.

A plain reading of Section 18–1101(c) of the LLC Act is consistent with Section 18–1104 and confirms that default fiduciary duties apply. Section 18–1101(c) states:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement. . . .

6 *Del. C.* § 18–1101(c). In his discussion in *Auriga,* the Chancellor reviewed the history of this provision, including the amendments adopted in response to dictum from the Delaware Supreme Court in *Gotham Partners. See Auriga,* 40 A.3d at 851–52. For the reasons that the Chancellor outlined in *Auriga,* the language and drafting history of Section 18–1101(c) support the existence of default fiduciary duties, because otherwise there would be nothing for the operating company agreement to expand, restrict, or eliminate. *Id.* at 852.

The introductory phrase "[t]o the extent that" in Section 18–1101(c) does not imply that the General Assembly was agnostic about the ontological question of whether fiduciary duties exist in limited liability companies. The same phrase appears in the parallel provision in the Delaware Limited Partnership Act (the "LP Act"), 6 *Del. C.* § 17–1101(d), and there has never been any serious doubt that the general partner of a Delaware limited partnership owes fiduciary duties.[2] As the Chancellor ex-

---

**2.** *See, e.g., Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood,* 752 A.2d 1175, 1180 (Del.Ch.1999) ("Unquestionably, the general partner of a limited partnership owes direct fiduciary duties to the partnership and to its limited partners."); *Metro Ambulance,* 1995 WL 409015, at *3 (listing "general partners" among the relationships that "carry the 'special' nature of a fiduciary relationship"); *McMahon v. New Castle Assocs.,* 532 A.2d

plained in *Auriga*, the introductory phrase "makes clear that the statute does not itself impose some broader scope of fiduciary coverage than traditional principles of equity." *Auriga*, 40 A.3d at 850 n. 34.

Put differently, the phrase "[t]o the extent that" embodies efficiency in drafting by the organs of the bar responsible for overseeing the alternative entity statutes and recommending changes to the General Assembly. In Section 17–1101(d), the full introductory phrase is "[t]o the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties)." Under the LP Act, there are two basic types of partners: general partners and limited partners. *Compare* 6 *Del. C.* § 17–401 (admission of general partner) *and* § 17–403 (general powers and liabilities of a general partner) *with* § 17–301 (admission of limited partner). General partners owe default fiduciary duties. Passive limited partners do not owe default fiduciary duties, but under certain circumstances, they can assume fiduciary duties if they take on an active role in the management of the entity. *See, e.g., Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *22 (Del.Ch. Mar. 13, 2000) (imposing fiduciary duties on limited partners based on circumstances of limited partnership's business); *KE Prop. Mgmt., Inc. v. 275 Madison Mgmt.*, 19 Del. J. Corp. L. 805, 821–22, 1993 WL 285900 (Del.Ch. July 27, 1993) (imposing fiduciary duties on limited partner who exercised discretionary authority). A "partner" thus might, or might not, owe default fiduciary duties. For Section 17–1101(d) to say that fiduciary duties can be restricted or eliminated "[t]o the extent that ... a partner" owes fiduciary duties recognizes these possibilities. A "person" similarly might not owe fiduciary duties to the entity, or could owe duties as an officer or employee of the partnership, as an agent, or as a party who controls an entity that serves in a fiduciary capacity. *See* Part II.E.2, *infra*. For Section 17–1101(d) to say that fiduciary duties can be restricted or eliminated "[t]o the extent that ... a partner or other person" owes fiduciary duties acknowledges these situationally specific possibilities and recognizes that epistemological questions about the extent to which a partner or other person owes duties will be answered by the role being played, the relationship to the entity, and the facts of the case.

The same is true for the LLC Act. Two of the three nouns that follow the phrase "[t]o the extent that" in Section 18–1101(c) ("member or manager or other person") may, or may not, owe fiduciary duties depending on the situation. Under the LLC Act, there are two basic types of members: members who are also managers and exercise managerial functions in a member-managed LLC, and members who are passive investors like limited partners. *Compare* 6 *Del. C.* § 18–401 (admission of managers) *and* § 18–402 (management of limited liability company) *with* § 18–301 (admission of members). Managers and managing members owe default fiduciary duties; passive members do not. As with a limited partnership, a "person" may owe fiduciary duties depending on whether that person controls a manager of the

601, 605 (Del.Ch.1987) (Allen, C.) (same); *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del.Ch.1981) ("it is clear that the general partner in a limited partnership owes a fiduciary duty to the limited partners"); Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1470 (2005) ("a general partner owes fiduciary duties to both the limited partnership and to the limited partners of the limited partnership").

LLC or otherwise has a fiduciary relationship to the LLC. The phrase "[t]o the extent that" recognizes these differing possibilities without implying that all members or all persons necessarily always or never owe default fiduciary duties.

In *Auriga*, the Chancellor discussed the critical role that default fiduciary duties play as an equitable gap-filler. *Auriga*, 40 A.3d at 853. One particular statutory feature of the LLC Act elevates the importance of the gap-filling role. Section 101(7) of the LLC Act defines a limited liability company agreement as "any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise), written, *oral* or implied, of the member or members as to the affairs of a limited liability company and the conduct of its business." 6 *Del. C.* § 18–101(7) (emphasis added). By authorizing oral LLC agreements, and by further authorizing "any agreement . . . as to the affairs of a limited liability company and the conduct of its business" to be deemed an LLC agreement, the LLC Act creates myriad opportunities for LLC agreements that range from the minimalistic to the ill-formed to the simply incomplete. In authorizing this level of informality, the LLC Act resembles its partnership forebears, where agreements likewise can be formed orally or by implication and where fiduciary duties are an important part of the entity landscape. *See, e.g.*, 6 *Del. C.* § 15–101(12); 6 *Del. C.* § 17–101(12). For the LLC Act to take the same approach suggests that the General Assembly assumed that a similar backdrop of default fiduciary duties would be available to fill the potentially considerable gaps in the parties' agreement.

The Delaware Supreme Court is of course the final arbiter on matters of Delaware law. The high court indisputably has the power to determine that there are no default fiduciary duties in the LLC context. To date, the Delaware Supreme Court has not made that pronouncement, and *Gatz* expressly reserved the issue. Until the Delaware Supreme Court speaks, the long line of Court of Chancery precedents and the Chancellor's dictum provide persuasive reasons to apply fiduciary duties by default to the manager of a Delaware LLC. As the managing member of Oculus, AK–Feel starts from a legal baseline of owing fiduciary duties.

## 2. The Operating Agreement Does Not Limit Or Eliminate The Managing Member's Default Fiduciary Duties

▮ Anticipating that default fiduciary duties apply, AK–Feel argues that Section 2.10 of the Operating Agreement eliminates any fiduciary duties that the managing member might otherwise owe. That is not a reasonable reading of the provision. Section 2.10 provides Oculus's members with exculpation against liability for certain types of claims. It does not restrict, modify, or eliminate fiduciary duties.

Section 1101(c) of the LLC Act, quoted above, empowers the drafters of a limited liability company to expand, restrict, or eliminate a member or manager's duties, including fiduciary duties. Section 1101(e) of the LLC Act authorizes something different: the drafters of a limited liability company can leave the default duties in place, but limit or eliminate monetary liability for breach of duty:

A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a

limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

6 *Del. C.* § 18–1101(e). By limiting or eliminating the prospect of liability but leaving in place the duty itself, a provision adopted pursuant to Section 1101(e) restricts the remedies that a party to the LLC agreement can seek. Monetary liability may be out, but injunctive relief, a decree of specific performance, rescission, the imposition of a constructive trust, and a myriad of other non-liability-based remedies remain in play. *See Arnold v. Soc. For Sav. Bancorp.*, 678 A.2d 533, 541–42 (Del.1996) (interpreting effect of similar exculpatory provision under 8 *Del. C.* § 102(b)(7)); *Leslie v. Telephonics Office Techs., Inc.*, 1993 WL 547188, at *9 (Del. Ch. Dec. 30, 1993) (same). A provision exculpating a member from liability for breach of fiduciary duty in accordance with Section 1101(e) of the LLC Act accomplishes a different result than a provision that modifies, restricts, or eliminates the underlying fiduciary duty itself, as contemplated by Section 1101(c) of the LLC Act. *See Gatz*, 59 A.3d at 1216–17; *Kelly*, 2010 WL 629850, at *11.

■ Drafters of an LLC agreement "must make their intent to eliminate fiduciary duties plain and unambiguous." *Bay Ctr.*, 2009 WL 1124451, at *9. Section 2.10 states, in pertinent part:

*Limited Liability of Members.* Except as and to the extent required under the Delaware Act or this Agreement, no Member shall be (i) liable for the debt, liabilities, contracts or any other obligations of the Company; or (ii) liable, responsible, accountable in damages or otherwise to the Company or the other Members for any act or failure to act in connection with the Company and its business unless the act or omission is attributed to gross negligence, willful misconduct or fraud or constitutes a material breach by such Member of any term or provision of this Agreement or any agreement the Company may have with the Member.

OA § 2.10. The plain language of this portion of Section 2.10 eliminates monetary liability unless, among other things, "the act or omission is attributed to gross negligence [or] willful misconduct or fraud . . . ." Section 2.10 provides limited exculpation from monetary liability as authorized by Section 1101(e). It does not limit or eliminate fiduciary duties as authorized by Section 1101(c).

Rather than eliminating fiduciary duties, the exculpatory language of Section 2.10 recognizes their continuing existence. Gross negligence is the standard for evaluating a breach of the duty of care. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). Willful misconduct is one standard for evaluating whether a fiduciary breached the duty of loyalty by acting in bad faith. *See Stone v. Ritter*, 911 A.2d 362, 369 (Del.2006). Language later in Section 2.10 requires Oculus to pay any premiums for insurance that the managing member might decide to purchase to protect any person otherwise entitled to indemnification under the Operating Agreement "against liability for any breach or alleged breach of fiduciary duty to the Company." OA § 2.10. If Section 2.10 had eliminated fiduciary duties, as AK–Feel argues, then it would be counter-intuitive for the same provision to recognize exceptions to exculpation for gross negligence and willful misconduct and to authorize the managing member to obtain insurance against actual or alleged breaches of fiduciary duty and require Oculus to pay the premiums.

Notably, Section 2.10 does not impose or establish the duty to act in a non-grossly negligent manner or to abjure willful misconduct or fraud. Section 2.10 assumes that those obligations already exist and could give rise to liability, then establishes that the grant of exculpation will not extend to instances in which the act or omission of a member is attributed to gross negligence, willful misconduct, or fraud. Section 2.10 therefore does not disclaim or eliminate fiduciary duties pursuant Section 18–1101(c). It rather (i) assumes that default fiduciary duties exist, (ii) limits only the potential availability of a monetary remedy, not the potential for injunctive or other equitable relief, and (iii) restores the availability of damages as a remedy for, among other things, gross negligence and willful misconduct.

### 3. Count III States A Claim.

■ Having determining that AK–Feel owes fiduciary duties and can be held liable for monetary damages under contractually specified circumstances, the next question is whether Count III pleads such a claim. Count III charges AK–Feel with gross negligence in connection with the Gatherings deal. According to NHA, AK–Feel (acting through Feeley) failed to provide the deposit called for by the written agreement to purchase the Gatherings, then failed to fix the mistake during the cure period, even after Oculus' counsel flagged the issue. *See* CC ¶ 221. Discovery may show that these allegations are untrue or that other factors mitigate the accusation of gross negligence. At the pleadings stage, however, NHA has stated a claim for breach of the duty of care against AK–Feel.

Count III also pleads a claim for willful misconduct. According to NHA, after the failure of the Gatherings deal, Feeley's behavior changed. He became "secretive and would leave the [Oculus] offices when talking on the telephone" so that Andrea Akel could not hear him. *Id.* ¶ 224. NHA subsequently learned that rather than negotiating deals for Oculus through AK–Feel, Feeley was negotiating deals for his own benefit. One potential transaction involved the Dail College Inn in Raleigh, North Carolina. The counterclaims allege that Feeley had formed an investment entity called College Inn–Feel, LLC, and was planning to take an equity position in the project with another sponsor. *See id.* ¶ 226. Feeley allegedly did the same thing with the Six Forks Station apartment building, also in Raleigh. *See id.* ¶ 227. According to NHA, it was only after Feeley's side-deals were discovered that Feeley caused AK–Feel to present the opportunities to Oculus. *See id.* ¶ 228. NHA believes and alleges that Feeley has continued to pursue opportunities on his own account that properly belong to Oculus. *See id.*

In response to the allegations of willful misconduct, AK–Feel argues if one assumes that Feeley was negotiating other transactions (as one must at the pleadings stage), then he was doing so on his own behalf and in his personal capacity, rather than on behalf of AK–Feel in his capacity as the managing member of AK–Feel. That is not an inference to which AK–Feel and Feeley are entitled on a motion to dismiss.

As the managing member of AK–Feel, Feeley controls the LLC. AK–Feel is an entity, not a natural person; it does not have a mind of its own. To the extent AK–Feel learns of opportunities and makes decisions about whether and how to pursue them, Feeley's mind makes those decisions. Unless Feeley has supernatural powers (and on a motion to dismiss NHA is entitled to the reasonable inference that he does not), Feeley cannot mentally seg-

regate his decision-making into an AK–Feel category and a not-AK-Feel category. If Feeley learns of an opportunity and shunts it to a different entity of his own, then Feeley has made a decision not only for himself but also for AK–Feel. That decision might give rise to a breach of duty by AK–Feel, or it might not, and whether Feeley legitimately received and pursued the opportunity in a personal capacity could well affect the outcome. At this stage of the proceedings, the allegations that Feeley made decisions to pursue opportunities through entities other than Oculus give rise to a sufficient inference of disloyalty to state a claim.

### E. Count IV: Gross Negligence

Count IV contends that AK–Feel and Feeley are liable to Oculus for "acts of gross negligence" relating to the failure to complete the Gatherings transaction. CC ¶ 260. NHA contends that AK–Feel owed a fiduciary duty of care in its capacity as managing member, which it breached, and that Feeley owed a fiduciary duty of care "in his role as Managing Member of AFE." *Id.* ¶ 259. Unlike Count III, where NHA sued Feeley in his role as the "actual manager of Oculus," Count IV names Feeley in his capacity as the party in control of AK–Feel, which in turn is the managing member of Oculus. This count states a claim against AK–Feel, but not against Feeley.

#### 1. Count IV Alleges That AK–Feel and Feeley Were Grossly Negligent.

In the heading for Count IV, NHA used the term "negligence" rather than "gross negligence." Latching onto this oversight, AK–Feel and Feeley observe that Delaware law does not impose liability on managing members for simple negligence. Read as a whole, Count IV makes clear that NHA is alleging gross negligence. An allegation in the body of Count IV states, "Plaintiff Feeley's failure, in his role as Managing Member of AFE, to make the required deposit payments in connection with The Gatherings project, and with total disregard of notification from counsel, as aforesaid, constituted at the very least gross negligence. . . ." *Id.* An allegation in the balance of the counterclaims likewise describes the Gatherings issue as "an act of gross negligence so devastating that it resulted in the loss of hundreds of thousands of dollars to OCG and, ultimately, to NHA and its owners." *Id.* ¶ 221. As previously discussed, Section 2.10 of the Operating Agreement excludes "gross negligence" from the scope of its exculpation from liability.

Taking the allegations in the counterclaims as a whole, Count IV states a claim for breach of the duty of care in connection with the Gatherings transaction. As to AK–Feel, Count IV is redundant and superfluous, because Count III already alleges a breach of the duty of care against AK–Feel. As to Feeley, however, Count IV is not redundant because it names Feeley in a different capacity. Count III asserted that Feeley breached his fiduciary duties in his capacity as the "actual manager of Oculus," a role that arguably implicates his status as President and CEO of Oculus and therefore potentially triggers arbitration under his Employment Agreement. Count IV asserts that Feeley breached his duty of care in his capacity as the individual in control of AK–Feel, a different role altogether. Whether Feeley can be sued in that capacity for a breach of the duty of care raises other issues, to which I now turn.

#### 2. The Claim Against Feeley As Controller Of AK–Feel

Feeley contends that NHA cannot sue him for breach of fiduciary duty as the

managing member of AK–Feel, because to do so would disregard the separate existence of AK–Feel. Feeley equates this result to piercing AK–Feel's corporate veil, and he contends that NHA has not carried the heavy burden Delaware law imposes on a party seeking to pierce. Feeley's argument improperly seeks to apply principles of corporate separateness that govern claims brought by third parties to the fiduciary relationships that exist within a business venture. But although Feeley can be sued by NHA for breach of fiduciary duty in his capacity as the party who controls AK–Feel, he cannot be sued in that capacity for breach of the duty of care.

As Feeley correctly observes, the separate legal existence of juridical entities is fundamental to Delaware law. Delaware law likewise respects the correlative principle of limited liability, which generally enables those who form entities to limit their risk to the amount of their investment in the entity. Both principles, however, operate to different degrees across different dimensions. Juridical entities regularly interact with the government (taxation and regulation), with third parties through consensual transactions (contract), and with third parties through non-consensual transactions (tort). Juridical entities also interact with internal constituencies, such as providers of capital, providers of labor, and the entities' own internal decision-makers. *See* Robert B. Thompson, *The Limits of Liability in the New Limited Liability Entities,* 32 Wake Forest L.Rev. 1, 3 (1997).

The principles of separate legal existence and limited liability have different implications across these dimensions, and different entities implement the principles to differing degrees. When interacting with the federal government for purposes of taxation, for example, a corporation typically is treated as a separate legal entity. Partnerships, limited partnerships, and LLCs typically are "pass-through" entities whose separate status is disregarded. *See id.* at 4–6. When making consensual commitments to third parties via contract, corporations and LLCs are typically treated as separate legal entities such that only the corporation or LLC is obligated to perform and liable for default. In a general partnership, the partnership is obligated to perform, but in the event of default, the general partners are individually liable for the debts of the firm. In a limited partnership, the partnership is obligated to perform, but there must be at least one general partner who is individually liable for the debts of the firm. The same principles apply when entities incur tort obligations through non-consensual transactions.

Numerous legal rules and doctrines circumvent the general principles of corporate separateness and legal liability. A government may choose to impose liability directly on owners or managers for certain types of activities. *See* Thompson, *supra,* at 12 & n. 59. The doctrine of piercing the corporate veil allows courts to permit contractual creditors to reach the assets of the owners of the entity based on a multifactor test. *See id.* at 9–10. Courts also may use piercing to benefit tort claimants, who additionally can recover from the individuals who committed the tort. *See id.* at 12; *see also* Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study,* 76 Cornell L.Rev. 1036, 1058 (1991) (reviewing statistical occurrence of piercing cases based on an underlying tort).

 The doctrine of piercing the corporate veil traditionally has not been applied to address internal claims of mismanagement or self-dealing brought by investors against the entity's decision-makers. In the corporate context, historically

the predominant limited liability vehicle, it has been unnecessary. The authority and concomitant duty to manage a Delaware corporation rests with the board of directors. *See 8 Del. C.* § 141(a). The members of a board of directors of a Delaware corporation must be natural persons. *See 8 Del. C.* § 141(d). Those individuals owe fiduciary duties of loyalty and care to the corporation. *See Mills Acq. Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del. 1989). Those duties require that the directors exercise their managerial authority on an informed basis in the good faith pursuit of maximizing the value of the corporation for the benefit of its residual claimants, *viz.,* the stockholders. *See eBay Domestic Hldgs., Inc. v. Newmark,* 16 A.3d 1, 35 (Del.Ch.2010). When stockholders contend that the board members breached their duties, a right of action exists (directly or derivatively) against natural persons.

▪ Breach of fiduciary duty is an equitable claim, and it is a maxim of equity that "equity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.,* 457 A.2d 734, 737 (Del.1983); *accord Gatz v. Ponsoldt,* 925 A.2d 1265, 1280 (Del. 2007) ("It is the very nature of equity to look beyond form to the substance of an arrangement."). Courts applying equitable principles therefore had little trouble extending liability for breach of fiduciary duty beyond the natural persons who served as directors to outsiders like majority stockholders who effectively controlled the corporation. *See, e.g., S. Pac. Co. v. Bogert,* 250 U.S. 483, 488, 39 S.Ct. 533, 63 L.Ed. 1099 (1919); *Sterling v. Mayflower Hotel Corp.,* 33 Del.Ch. 293, 298, 93 A.2d 107, 110 (Del.1952). And because the application of equitable principles depended on the substance of control rather than the form, it did not matter whether the control was exercised directly or indirectly through subsidiaries. The United States Supreme Court's rejection of the corporate separateness argument in *Southern Pacific* is illustrative:

The Southern Pacific contends that the doctrine under which majority stockholders exercising control are deemed trustees for the minority should not be applied here, because it did not itself own directly any stock in the old Houston Company; its control being exerted through a subsidiary, Morgan's Louisiana & Texas Railroad & Steamship Company, which was the majority stockholder in the old Houston Company. But the doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustee for the minority does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.

250 U.S. at 491–92, 39 S.Ct. 533. Delaware corporate decisions consistently have looked to who wields control in substance and have imposed the risk of fiduciary liability on the actual controllers.[3]

---

**3.** *See Kahn v. Lynch Commc'n Sys. Inc.,* 638 A.2d 1110, 1114 (Del.1994) (holding that 43% stockholder that exercised actual control over subsidiary could be liable for breach of fiduciary duty); *Sterling,* 93 A.2d at 109–10 (citing "the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property"); *Keenan v. Eshleman,* 2 A.2d 904, 908 (Del.1938) (affirming imposition of liability on directors for management fees paid by corporation to second corporation that was its controlling stockholder, where directors also controlled the controlling stockholder; "The conception of corporate entity is not a thing so opaque that it cannot be seen through; and, viewing

The Delaware alternative entity statutes highlight the tension between corporate separateness and the outcomes achieved in equity by imposing fiduciary duties on those actually in control. Delaware's original alternative entity statute, the LP Act, does not restrict service as a general partner to natural persons, opening the door to corporations serving in that role.[4] At the same time, the LP Act declares as public policy the goal of granting the broadest freedom of contract possible.[5] Other Delaware alternative entity statutes, including the LLC Act and the Delaware Statutory Trusts Act, are modeled on the LP Act, permit entities to serve in managerial roles, and adopt the same policy of maximizing freedom of contract.[6]

---

the transaction as one between corporations, casual scrutiny reveals that the appellants, in fact, dealt with themselves to their own advantage and enrichment. The employment of Consolidated by Sanitary was merely the employment by the appellants of themselves to do what it was their plain duty to do as officers of Sanitary."); *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *15 (Del.Ch. July 26, 2010) ("Fairly read, the complaint alleges that DLJ, Inc. presided over a family of entities that it dominated and controlled, including the entities that together owned 74% of Insilco's equity. Using their unified power in a concerted way, DLJ controlled Insilco and directed its business strategy, including causing it to employ the DLJ Advisors.... I believe that Shandler has pled sufficient facts from which it can be inferred that the DLJ Funds were instrumentalities operated for the benefit of DLJ, Inc. and DLJMB."); *In re Primedia, Inc. Deriv. Litig.*, 910 A.2d 248, 258 n. 26 (Del.Ch.2006) (holding that private equity firm could owe fiduciary duties to non-controlling stockholders when firm controlled corporation through intervening entities); *Allied Chem. & Dye Corp. v. Steel & Tube Co.*, 120 A. 486, 491 (Del.Ch. 1923) ("When, in the conduct of the corporate business, a majority of the voting power ... join hands in imposing its policy upon all, it is beyond all reason ... to take any view other than that they are to be regarded as having placed upon themselves the same sort of fiduciary character which the law impresses upon directors in their relation to all stockholders."); *Martin v. D.B. Martin Co.*, 88 A. 612, 615 (Del.Ch.1913) ("For the protection of the rights of stockholders of the dominant, or parent company, and for righting of wrongs done to them by means of the control of the dominant, or parent, company ... the latter are to be treated as agents of the former, or even as identical with each other.").

4. *See* 6 *Del. C.* § 17–101(5) (" 'General partner' means a person who is named as a general partner in the certificate of limited partnership or similar instrument ... and who is admitted to the limited partnership as a general partner ..."); *id.* § 17–101(14) (" 'Person' means a natural person, partnership (whether general or limited), limited liability company, trust ..., estate, association ..., corporation ... or any other individual or entity (or series thereof) ..."). *See generally* Robert W. Hamilton, *Corporate General Partners of Limited Partnerships*, 1 J. Small & Emerging Bus. Law 73 (1997) (discussing the origins and implications of corporate general partners).

5. *See* 6 *Del. C.* 17–1101(c) ("It is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements"); Martin I. Lubaroff & Paul M. Altman, *Lubaroff & Altman on Delaware Limited Partnerships* § 1.2 (1995 & 2010 Supp.).

6. *See* 6 *Del. C.* 18–1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."); *see also* 12 *Del. C.* § 3825(b) ("It is the policy of this subchapter to give the maximum effect to the principle of freedom of contract and to the enforceability of governing instruments"); *PHL Variable Ins. Co. v. Price Dawe Ins. Trust*, 28 A.3d 1059, 1077 (Del.2011) ("The policy of the Delaware Statutory Trust Act is to give maximum effect to freedom of contract...."); *Olson v. Halvorsen*, 986 A.2d 1150, 1160 (Del.2009) ("The Delaware LLC Act seeks to give maximum effect to the principle of freedom of contract...." (internal quotation marks omitted)); *Elf Atochem*, 727 A.2d at 290 ("The Delaware [LLC] Act has been modeled on the popular Delaware LP Act.... The policy of freedom of contract underlies both the [LLC] Act and the LP Act.").

This Court soon confronted the question of what to do with the human controllers of an entity fiduciary. In *In re USACafes, L.P. Litigation,* 600 A.2d 43 (Del.Ch.1991), Chancellor Allen considered whether limited partners of USACafes, L.P., could sue the directors of USACafes General Partner, Inc., its corporate general partner, for breach of fiduciary duty. Defendants Sam and Charles Wyly comprised two of the six directors on the board of the corporate general partner, owned 100% the stock of the corporate general partner, and held 47% of the limited partnership units. In the challenged transaction, USACafes sold its assets to Metsa Acquisition Corp., a third party acquirer, for $72.6 million, representing $10.25 per partnership unit. Metsa paid an additional $15 to $17 million to the Wylys and the other directors of the corporate general partner in the form of consideration for covenants not to compete, releases of claims, forgiveness of loans, and payments under employment agreements. *See id.* at 47–48. The defendants conceded that the general partner owed fiduciary duties to the limited partners, but they argued that the members of the board of the corporate general partner only owed fiduciary duties to its stockholders, not to the limited partners. *Id.*

Chancellor Allen rejected the defendants' argument. Finding no precedent on point, Chancellor Allen started from the general principle that "one who controls property of another may not, without express or implied agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner." *Id.* at 48. He then noted the equitable tradition of looking to the substance of where control lay, observing that "[w]hen control over corporate property was recognized to be in the hands of the shareholders who controlled the enterprise, the fiduciary duty was found to extend to such persons as well." *Id.* Analogizing the corporate general partner to a corporate trustee, a structure where there was a longer tradition of an entity acting as fiduciary, Chancellor Allen noted that courts held the individuals who controlled or made decisions on behalf of the corporate trustee liable for breaches of trust. *See id.* at 48–49 (citing 4 A. Scott & W. Fratcher, *The Law of Trusts* § 326.03, at 304–06 (4th ed.1989)). He concluded that "[t]he theory underlying fiduciary duties is consistent with recognition that a director of a corporate general partner bears such a duty towards the limited partnership." *Id.* at 49.

> Consider, for example, a classic self-dealing transaction: assume that a majority of the board of the corporate general partner formed a new entity and then caused the general partner to sell partnership assets to the new entity at an unfairly small price, injuring the partnership and its limited partners. Can it be imagined that such persons have not breached a duty to the partnership itself? And does it not make perfect sense to say that the gist of the offense is a breach of the equitable duty of loyalty that is placed upon a fiduciary?

*Id.* Chancellor Allen recognized that the resulting fiduciary duty "may well not be so broad as the duty of the director of a corporate trustee." *Id.* He left to future cases the task of delineating the full scope of the duty, holding only that "it surely entails the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership." *Id.*

In subsequent decisions involving limited partnerships, this Court has followed *USACafes* consistently, holding that the individuals and entities who control the general partner owe to the limited part-

ners at a minimum the duty of loyalty identified in *USACafes*.[7] This Court's decisions also have extended the doctrine to other alternative entities, such as LLCs[8] and statutory trusts.[9] In doing so, this Court has noted the tension between corporate separateness and the application of fiduciary principles, but has nevertheless adhered to *USACafes*. *See Gelfman,* 792 A.2d at 992 n. 24; *Gotham P'rs L.P.,* 795 A.2d at 34.

The Delaware Supreme Court indisputably has the authority to revisit this Court's approach and address the tensions created by *USACafes*. The high court might hold, contrary to *USACafes,* that when parties bargain for an entity to serve as the fiduciary, that entity is the fiduciary, and the parties cannot later circumvent their agreement by invoking concepts of control or aiding and abetting. Or the high court might distinguish between cases involving default fiduciary duties, in which traditional equitable principles of control and aiding and abetting could be permitted to extend liability beyond the entity fiduciary, and cases involving purely contractual duties, in which parties would be limited to contractual remedies against their contractual counterparties. Doubtless many other approaches could be envisioned. But in this Court, and for purposes of this decision, *USACafes* and its progeny are *stare decisis.*

Feeley therefore can·be reached and potentially held liable for breach of fiduciary duty in his capacity as the controller of AK–Feel. In Count IV, however, NHA seeks to hold Feeley liable only for a breach of the duty of care. Chancellor Allen noted in *USACafes* that while the parties in control of a corporate general partner are fiduciaries, the duties they owe "may well not be so broad as the duty of the director of a corporate trustee." 600 A.2d at 49; *see also id.* at n. 3 (declining to determine if corporate opportunity theory or waste theories could be pursued against a controlling general partner). *USACafes*

7. *See, e.g., Paige Capital Mgmt. LLC v. Lerner Master Fund, LLC,* 2011 WL 3505355, at *30 (Del.Ch. Aug. 8, 2011) (applying *USACafes* to impose fiduciary liability on individual who was the managing member of the LLC that acted as general partner for limited partnership); *Gelfman v. Weedon Investors, L.P.,* 792 A.2d 977, 992 n. 24 (Del.Ch.2001) (applying *USACafes* to directors and officers of corporate general partner); *Gotham P'rs, L.P.,* 795 A.2d at 34 (Del.Ch.2001) (applying *USACafes* to individuals and entities who controlled corporate general partner), *aff'd in part* 817 A.2d 160 (Del.2002); *Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson Birtcher P'rs,* 2001 WL 1641239, at *8 (Del.Ch. Dec. 4, 2001) (explaining that "affiliates of a general partner who exercise control over the partnership's property may find themselves owing fiduciary duties to both the partnership and its limited partners"); *Wallace,* 752 A.2d at 1182 (applying *USACafes* and stating that "unquestionably, the general partner of a limited partnership owes direct fiduciary duties to the partnership and its limited partners."); *In re Boston Celtics Ltd. P'ship S'holders Li-* tig., 1999 WL 641902, at *4 (Del.Ch. Aug. 6, 1999) (applying *USACafes* to directors of corporate general partner); *James River–Pennington, Inc. v. CRSS Capital, Inc.,* 1995 WL 106554, at *11 (Del.Ch. Mar. 6, 1995) ("The JRP Directors have fiduciary duties to the Partnership and its limited partners because they control the Partnership property.").

8. *See Bay Ctr.,* 2009 WL 1124451, at *8–9 (holding that complaint stated claim for breach of fiduciary duty under *USACafes* against sole member of LLC that acted as managing member for LLC); *see also Paige Capital,* 2011 WL 3505355, *30 (applying *USACafes* at two levels, first to LLC that acted as general partner for limited partnership, and second to managing member of LLC).

9. *See Cargill, Inc. v. JWH Special Circumstance LLC,* 959 A.2d 1096, 1111–12, 1119–21 (Del.Ch.2008) (holding that complaint stated claim for breach of fiduciary duty under *USACafes* against the parent and grandparent entities who controlled the managing owner of a statutory trust).

has not been extended beyond duty of loyalty claims. *See Bay Ctr.*, 2009 WL 1124451, at \*10 ("In practice, the cases applying *USACafes* have not ventured beyond the clear application stated in *USACafes:* the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership." (internal quotation marks omitted)). Because Count IV only asserts claims against Feeley for gross negligence, it is dismissed.

### F. Count V: Declaratory Judgment

Finally, Count V of NHA's counterclaims seeks a declaratory judgment establishing that NHA has the unilateral right under Section 2.10 of the Operating Agreement to cause Oculus to "cease business operations" and that NHA's liability would be limited under those circumstances to paying Feeley and Akel any severance to which they might be entitled. NHA envisions that after invoking this right, Oculus "would become a mere holding company with the sole purposes of (1) receiving income from its remote and indirect interest in the Slippery Rock project and distributing such income in accordance with the OCG operating agreement, and (2) serving as an indirect conduit for the management of the Slippery Rock project." CC ¶ 272. According to NHA, Oculus "would not, under such circumstances, be conducting business operations." *Id.* NHA further contends that

> [U]pon such cessation of business operations, OCG would no longer have the need for employees, and any employment agreements, including the Feeley employment agreement, if adjudged to be extant, would necessarily terminate, whereupon the sole issue as to Feeley would be NHA's responsibility to plaintiff Feeley for severance benefits, which issue would be subject to mandatory arbitration pursuant to the Feeley employment agreement.

*Id.* ¶ 273. Count V does not state a claim, and the motion to dismiss Count V is granted.

 The contention that Oculus would not be "conducting business operations" if NHA achieved its desired outcome conflicts with this Court's precedents. Delaware law recognizes that an entity may be "formed and maintained as a passive instrumentality—for example, an entity that does no more than take and hold title to tangible investments is a commonly encountered phenomenon." *Giancarlo v. OG Corp.*, 15 Del. J. Corp. L. 606, 613, 1989 WL 72022 (Del.Ch. June 23, 1989) (Allen, C.). "[F]unctioning as a passive instrumentality that is holding title to assets, a corporate function that is both lawful and common," is a form of conducting business. *In re Seneca Invs. LLC*, 970 A.2d 259, 263 (Del.Ch.2008). Not surprisingly, NHA has not articulated how Oculus could receive and distribute income from the Slippery Rock project and serve as an indirect conduit for managing that project without conducting business operations. Nor has NHA explained how these tasks could be accomplished without some human agency acting on Oculus's behalf. What NHA really wants is for Oculus to continue business operations, but to conduct them differently.

 More importantly, NHA does not actually have the right to cause Oculus to "cease business operations." The two sections of the Operating Agreement that directly address Oculus's life span as an entity do not contemplate termination after two years or a springing dissolution right. Section 2.4, entitled *"Term,"* states: "The Company's existence as a legal entity . . . shall continue until the date on which it is dissolved pursuant to Article 11 of this Agreement and the Certificate of Forma-

tion cancelled in accordance with the Act." OA § 2.4. Section 11.1, which addresses dissolution, states:

The Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following:

(a) The latest date on which the Company is to dissolve, if any, as set forth in the Certificate of Formation; or

(b) The vote or written consent of a majority of interest of the Members.

(c) The bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member or the occurrence of any other event that terminates the continued membership of any Member, unless within one hundred eighty (180) days after such event the Company is continued by the vote or written consent of the remaining Members.

*Id.* § 11.1.

The three provisions on which NHA relies do not provide any additional support for NHA's theory. First, NHA cites Section 4.6 of the Operating Agreement, under which NHA was obligated to fund an " 'Operating Facility' for a two-year period, upon the expiration of which all obligations of NHA to providing [sic] funding would end." CC ¶ 194. It is true that NHA committed to make available to Oculus "a revolving line of credit of up to $1,000,000 funded by NHA and used by the Company to pay for all overhead and operation costs necessary to maintain the Company as a going concern, subject to the provisions of Section 4.6 herein." *Id.* § 1.1(w) (the "Operating Facility"). It is also true, and partially consistent with NHA's theory, that Oculus had "the ability to draw against the Operating Facility for a period of two (2) years." *Id.* § 4.6(b). But contrary to NHA's theory, the Operating Agreement did not call for the Operating Facility to terminate, accelerate, or otherwise come due at the two-year mark.

Instead, the Operating Facility would continue and "expire on the fifth (5th) anniversary of the date of this Agreement unless extended by the unanimous consent of the Members." *Id.* During years three to five, Oculus was required to use its cash flows to pay down any balance:

Any cash flow or proceeds after (i) the payment of the then current operating expenses of the Company and (ii) the Company maintaining an operating account balance equal to the greater of $75,000 and three months of anticipated operating expenses calculated based on the Company's Budget, derived by the Company from distributions from or operations of any of the Company's business activities shall first be applied to the repayment to NHA of any outstanding amounts funded under the Operating Facility, until such time as said amounts have been repaid in full.

*Id.* § 4.6. It is therefore not accurate to claim that NHA only was obligated to fund the Operating Facility "for a two-year period, upon the expiration of which all obligations of NHA to providing [sic] funding would end." CC ¶ 194. Although Oculus only could draw on the facility for two years, NHA had to keep the Operating Facility in place for five years, a fact that is inconsistent with NHA's theory.

Second, NHA cites the initial term of Feeley's Employment Agreement, which ran from January 15, 2010, until January 14, 2012. *See* CC ¶ 198–99. As with the Operating Facility, the initial term of the Employment Agreement was two years, but it did not automatically terminate at that point. Instead,

[t]hereafter, this Agreement shall be extended automatically for successive terms of One (1) year unless (i) the Company or [Feeley] shall give written notice of termination to the other party hereto at least Sixty (60) days prior to

the termination of the initial term of employment hereunder or any renewal term thereof, or (ii) unless earlier terminated as herein provided.

EA § 1.4. Rather than ending at two years, the Employment Agreement contemplated that Feeley's employment would continue on an annual basis. And because Oculus had the right to give written notice of termination and because AK–Feel was the managing member of Oculus, the Employment Agreement ensured that Feeley only would be terminated if AK–Feel was first removed as managing member. NHA did not have a right to replace AK–Feel as managing member after two years, making it almost certain that the Employment Agreement would renew and continue beyond the two-year mark. This too is inconsistent with NHA's theory.

Third, NHA relies on Section 2.10 of the Operating Agreement as ostensibly giving NHA the right to cause Oculus "to unilaterally 'cease business operations' at any time, which would necessarily terminate the employment of Plaintiff Feeley and Defendant Andrea Akel, leaving their entitlement to severance as the only remaining issue." CC ¶ 194. The plain language of the provision NHA cites does not create a right at all. It is rather a condition that triggers an additional contractual obligation on the part of NHA.

As previously discussed, Section 2.10 of the Operating Agreement limits the liability of Oculus's members, subject to various exceptions. The last sentence of Section 2.10 creates one such exception:

> Notwithstanding the foregoing to the contrary [sic], if NHA determines that the Company shall cease business operations, then in connection with such cessation, NHA shall assume any and all severance liability that the Company may have under existing employment agreements with Christopher J. Feeley and Andrea Akel.

OA § 2.10. NHA reads this provision as accomplishing two things: (i) granting NHA the right to cause Oculus to "cease business operations" and (ii) limiting NHA's liability under those circumstances to any severance payments due to Feeley and Akel. The plain language of the provision does not grant NHA any affirmative rights. It states that *if* NHA has determined that the Company shall cease business operations, *then* NHA shall assume liability for the severance obligations. Rather than limiting NHA's liability, the severance obligation expands it, because otherwise Oculus, not NHA, would be liable for the contractual severance payments.

This portion of Section 2.10 dovetails with the dissolution and winding up provisions in Article 11. Section 11.2 is the only other section of the Operating Agreement that speaks of Oculus ceasing business operations. It states that "[u]pon the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business." *Id.* § 11.2. Section 11.1 identifies three dissolution triggers, one of which is "[t]he vote or written consent of a majority in interest of the Members." *Id.* § 11.1(b). The assumption of liability language in Section 2.10 recognizes that if NHA determines that Oculus should dissolve, for example by voting in favor of dissolution, then the severance obligations that otherwise would be obligations of Oculus become obligations of NHA.

AK–Feel argues that there could be other circumstances under which NHA could decide to cause Oculus to "cease business operations," triggering the severance obligation. Those situations might include NHA petitioning for judicial dissolution,

taking actions to create a deadlock, or unreasonably refusing for an extended period to approve a budget for Oculus. Perhaps so. For present purposes, what matters is that Section 2.10 does not grant NHA a unilateral right to force Oculus to "cease business operations," nor does Section 2.10 limit NHA's liability to contractual severance obligations if NHA determines that Oculus should "cease business operations."

Finally, NHA argues that as a matter of fundamental fairness, it should have the right to cause Oculus to "cease business operations." The unfairness that NHA perceives rests on a persistent misunderstanding about how the Operating Agreement calls for Oculus to make real estate investments. According to NHA, Oculus was supposed to form a new and separate entity as a special purpose vehicle for each real estate investment. As NHA envisions it, Oculus would *not* retain any ownership stake in the special purpose entity. The only ongoing connection between Oculus and the special purpose entity would be potentially overlapping investors. NHA takes umbrage at the fact that for the Slippery Rock transaction, Feeley did not form a completely separate entity, but rather created a new, wholly owned subsidiary of Oculus named OCG–SR, LLC. That entity in turn became the general partner of and received a 20% equity interest in OCG–Slippery Rock, L.P., the owner of the Slippery Rock project. NHA alleges that Feeley failed to understand that Oculus "was not supposed to own anything in its own name" and accuses Feeley of being "completely ignorant of the need for [a special purpose entity] until it was brought to his attention by Defendants." CC ¶¶ 214–15. In NHA's view, Oculus should not have any assets, and the members should have no trouble agreeing freely to dissolve an entity with no value. NHA claims that it is only because Oculus

mistakenly owns the Slippery Rock project that Oculus cannot readily be dissolved, leading NHA to assert its purported right to cause Oculus to "cease business operations" as an alternative solution.

NHA's understanding conflicts with the plain language of the Operating Agreement. Section 2.3 defines Oculus's purposes as follows:

> (i) *to acquire on its own behalf through wholly owned special purpose entities, multifamily and commercial real estate assets;* (ii) provide capital market services for real estate assets acquired by the Company; (iii) provide capital market advisory services to third party borrowers, lenders, and equity providers, (iv) pursue other real estate opportunities, and (v) to engage in any lawful business purpose or purposes for which limited liability companies may be formed under the Act.

OA § 2.3 (emphasis added). Consistent with the expectation that Oculus would acquire real estate assets "on its own behalf through wholly-owned special purpose entities," Section 3.8(e) of the Operating Agreement requires the members to "mutually agree" if "in lieu of the Company participating directly" they wished to pursue "an investment opportunity independently and on their own behalf" and for Oculus to "have no interest or involvement in such opportunity." *Id.* § 3.8(e).

Numerous other provisions of the Operating Agreement anticipate that Oculus will own special purpose entities and receive cash flows from the interests in real estate investments that those entities own. For example, the Operating Agreement contemplates that Oculus will receive "Capital Proceeds," defined to include proceeds from "any sale, disposition financing, or refinancing of a Company investment." *Id.* § 1.1(j)-(k); *see id.* § 7.2. The Operating Agreement also contemplates that

Oculus will receive "Available Cash Flow" derived from various types of investment opportunities. *Id.* § 1.1(e), (*l*); *see id.* § 7.1. The Operating Agreement specifies formulas by which Oculus will allocate to AK–Feel or NHA the "Capital Proceeds," operating cash flows, and other fees, with the splits determined by whether AK–Feel or NHA originates the idea, whether AK–Feel secures third party debt or equity capital, and whether NHA or any of its members provide any guarantees. *See Id.* §§ 1.1(i), (*l*), (bb), 6.2, 7.1–7.6. It would be nonsensical for the Operating Agreement to anticipate Oculus receiving these amounts and to address how to divvy them up and distribute them to Oculus's members if in reality Oculus was never supposed to own anything.

NHA's belief that Oculus was not supposed to own any special purpose entities with interest in real estate investments lacks any grounding in and conflicts with the plain language of the Operating Agreement. The terms and structure of the Operating Agreement demonstrate that the parties intended for Oculus to own interests in special purpose entities, to receive operating cash flows and generate capital proceeds from those interests, and to achieve the ability to operate on a stand-alone basis within two years, without any on-going need to rely on the Operating Facility. Feeley complied with the plain language of the Operating Agreement when he formed OCG–SR, LLC as a "wholly-owned special purpose entit[y]" to hold a 20% interest in OCG–Slippery Rock, L.P. It would be fundamentally unfair to allow NHA to stretch a conditional obligation into an affirmative right designed to remedy what was never a wrong in the first place.

The request for a declaratory judgment is contrary to the plain language of the Operating Agreement. Count V fails to state a claim.

## III. CONCLUSION

The motion to dismiss Count I is granted, except as to the first of its three subsections, which AK–Feel chose to answer, and the allegation in paragraph 246(d). The motion to dismiss Count II is granted, except to the extent it alleges aiding and abetting in connection with the portion of Count I that survives. The motion to dismiss Count III is denied as to AK–Feel. As to Feeley, Count III is stayed pending arbitration. The motion to dismiss Count IV is denied as to AK–Feel and granted as to Feeley. The motion to dismiss Count V is granted. **IT IS SO ORDERED.**