**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: May 26, 2017
Date Decided: July 10, 2017

Dean A. Campbell, Esquire
Law Office of Dean A. Campbell LLC
20175 Office Circle
Georgetown, DE 19947

Paul Brown, Esquire
Chipman Brown Cicero & Cole LLP
1313 N. Market Street, Suite 5400
Wilmington, DE 19801

> Re: *Beach to Bay Real Estate Center LLC et al. v. Beach to Bay Realtors Inc. et al.*, Civil Action No. 10007-VCG

Dear Counsel:

In Yoknapatawpha County, Faulkner tells us, the "past is never dead. It's not even past." It must be so in Sussex, if this case is any indication. This matter involves a Sussex-centered real estate sales venture, ultimately unsuccessful and, according to the Plaintiffs, giving rise to a dog's breakfast of claims and accountings, mostly concerning acts taking place during the time of the administration of the second President Bush. The Defendants moved to dismiss three of the Counts. Three years ago. The matter was fully briefed in 2014, and oral argument had been scheduled. I continued the argument, at the parties' request, because they were "exploring" settlement.

Outside the litigation, the world continued to turn. Births and deaths occurred, heartaches were endured, aspirations were pursued, wars were fought. Inside the

litigation, in the micro-world of *Beach to Bay v. Beach to Bay*, time stood still. Apart from rousing themselves to answer, in desultory fashion, occasional proddings from this Court (themselves, I admit, less than energetic), the parties were content in a world slowed to the pace of matter chilled to near-absolute zero. Eventually, following a mandatory appearance of counsel at a call of the calendar, sufficient thaw set in to revive consideration of this partial motion to dismiss. The parties consented—that is, impliedly consented by failing to respond to a letter from the Court—to consideration of the briefs without amendment or update, and sans oral argument. Therefore, I have addressed the issues as fixed in the briefs from 2014 like flies in amber.

For the reasons that follow, Count II, and what I have termed in this Letter Opinion "Alias Count VI" of the Complaint, are dismissed. The Complaint, among other idiosyncrasies, contains two Counts V; a part of one of those Counts is dismissed as well.[1] The other Counts remain to be litigated.[2]

### I. FACTS[3]

This dispute arises from the winding-down of a limited liability company formed as a real estate sales venture between two realtors. The Complaint in this

---

[1] *See infra* Section I.C.

[2] That is, "remain to be litigated" as an existential matter. These Counts, like the earth (or The Dude) abide. It remains to be seen if the parties will be inspired to actually litigate them as scheduled in November.

[3] The facts, except where otherwise noted, are drawn from the well-pled allegations of Plaintiffs' Verified Complaint (the "Complaint" or "Compl.") and exhibits or documents incorporated by

matter is somewhat difficult to follow. Compounding the lack of clarity of the allegations in the Complaint is the absence of written documents ordering the affairs of the parties and entities. That is, there is no written operating agreement for the LLC; instead, according to the Complaint, a series of promises and assurances, mostly oral, were made that purport to govern the parties' relationships. Also problematic, the alleged promises and assurances, and Plaintiffs' theory of the case, appear to be in tension with the sole written document. The Plaintiffs seek two primary recoveries: a truing-up of contributions and loans to the entity, and recovery for conversion of assets and confidential information. In pursuit of these recoveries the Plaintiffs offer variegated allegations and theories, some of which are the subject of this Partial Motion to Dismiss.

*A. The Parties*

The Plaintiffs in this matter consist of two Delaware limited liability companies, Beach to Bay Real Estate Center, LLC, ("Center"), AJ Realty, LLC ("AJ"), and an individual associated with each entity, Anthony Kulp.[4] AJ is the managing member of Center, and holds a majority interest in Center.[5] Kulp "is the

---

reference therein, which are presumed true for purposes of evaluating the Defendants' Partial Motion to Dismiss.

[4] Compl. ¶¶ 1–3.

[5] *Id.* at ¶ 2.

agent for AJ acting as managing member of" Center, and has been a Delaware licensed real estate broker and agent at all times relevant to this action.[6]

There are several Defendants in this action. Defendant Beach to Bay Realtors, Inc. ("Realtors") is a Delaware Corporation owned by Defendant Andy Staton.[7] Defendant Realtors is a minority member of Plaintiff Center.[8] The Complaint indicates that Staton was also a member of Plaintiff Center.[9] Staton is a Delaware licensed real estate agent who heads "The Andy Staton Team."[10] Defendant G.R. Peter Karsner was a member of Defendant Realtors through "at least" 2009.[11]

Staton and his team of realtors are currently affiliated with Defendant Prudential Gallo Realtors of Rehoboth ("Prudential Gallo").[12] Defendants Rick Allamong and John Marino are both realtors who are associates with "The Andy Staton Team."[13]

---

[6] *Id.* at ¶¶ 3, 13.
[7] *Id.* at ¶¶ 5–6.
[8] *Id.* at ¶ 5.
[9] *Id.* at ¶ 6.
[10] *Id.* at ¶ 14.
[11] *Id.* at ¶¶ 7, 17.
[12] *See id.* at ¶¶ 8–10, 14, 24.
[13] *Id.* at ¶¶ 9–10.

4

*B. Center's Development*

1. Beach to Bay Real Estate Center's Origins

In April 2005 Staton, Kulp and a third party formed "The Beach to Bay Team."[14] The Beach to Bay Team was "a real estate entity created for the purpose of marketing and selling real estate" in southern Delaware.[15] Eventually, in February 2006 "Kulp, by and through AJ, and Staton, by and through [Realtors], merged the Beach to Bay Team into [Center]."[16] At this time, AJ was a member of Center holding a 51% interest and Realtors was a member of Center holding a 49% interest.[17] The Complaint is silent as to whether this was the time when Center was officially formed as a LLC. Apparently, there was no operating agreement for Center drafted at this time, or any subsequent time.

The Complaint alleges that between February 2006 and October 2006, "AJ/Kulp continued to make capital contributions" to Center but that "Realtors/Staton ceased making capital contributions."[18] To address the different capital contributions, on October 24, 2006 "Kulp and . . . Realtors/Staton executed an agreement whereby it was agreed that . . . Realtor's [sic] /Staton's interest would be reduced to twenty-two percent (22%) and which further authorized Kulp to

---

[14] *Id.* at ¶ 15.
[15] *Id.*
[16] *Id.* at ¶ 16.
[17] *Id.*
[18] *Id.* at ¶ 18.

continue making capital contributions in exchange for a further reduction of . . . Realtor's [sic] /Staton's interest."[19]  The October 24, 2006 agreement (the "2006 Agreement"), attached as an exhibit to the Complaint, is the only written document before the Court memorializing the parties' relationship.[20]

Beyond permitting dilution for unequal capital contributions, the 2006 Agreement provides further content and context not clearly explained in, or omitted from, the Complaint.  The recitals to the agreement indicate that Kulp and Realtors/ Staton "verbally agreed to enter into the real estate business together" and formed Center on June 1, 2005 "based on" such oral agreement.[21]  Via the verbal agreement Staton and Kulp "anticipated and agreed that each party would contribute approximately fifty percent" of the capital needed to run Center.[22]  Further, the recitals to the 2006 Agreement make clear that "no written operating agreement for [Center] h[ad] been drafted or signed by the parties."[23]  The 2006 Agreement adds that for the 2005 tax year Kulp benefited from 51% of Center's losses whereas Staton claimed 49%.[24]  The recitals further add that Staton has not contributed capital in

---

[19] *Id.* at ¶ 19.
[20] *Id.* at Ex. A.  *But see* Defs' Opening Br. Ex. A.  The Defendants' attached to their opening brief a so-called "Commission Agreement" between Staton, Kulp, and a third-party executed on August 19, 2004.  *Id.*  It is not clear at this stage what role, if any, such agreement plays in this matter.
[21] Compl. Ex. A at 1.
[22] *See id.*
[23] *See id.*
[24] *See id.*

6

proportion to his percentage interest but instead contributed only 22% of Center's needed capital despite getting the tax benefit of 49% of Center's losses.[25]

Due to the unequal contributions of capital the operative portion of the 2006 Agreement provides that Staton would assign 27% of his 49% interest to Kulp.[26] Further, the operative portion of the Agreement permits Kulp "in his sole and absolute discretion" to make future capital contributions to Center and that when such contributions are made Staton is to be notified in writing of the contribution and given ninety days from the notification to pay the portion of the contribution that corresponds to his ownership interest in Center.[27] If Staton failed to contribute the required amount within the required timeframe, his ownership interest in Center "shall automatically . . . be reduced to a percentage equivalent" of Staton's capital contributions to Center relative to Kulp's.[28] The operative provisions further add that Kulp "may, at any time and [his] sole option, either contribute capital to [Center], or loan funds at a commercially reasonable rate of interest to [Center] . . . ."[29] The 2006 Agreement was executed by Kulp individually, and by Staton individually and on behalf of Realtors as its sole shareholder and President.[30]

---

[25] *See id.*
[26] *See id.* at 2.
[27] *See id.*
[28] *See id.*
[29] *See id.*
[30] *See id.* at 3.

2. Events Following Center's Formation and the 2006 Agreement

Between February 2005 and March 6, 2008 "Realtors/Staton" made contributions to Center totaling $110,600.[31] During a similar period ending February 25, 2008, "AJ/Kulp" contributed $399,300.[32] From May 27, 2008 to April 16, 2015 "AJ/Kulp made contributions *or* loans to [Center] in the amount of $379,770.05."[33]

In 2009 Staton affiliated himself as an agent with Prudential Gallo forming the Andy Staton Team which consisted of himself, Allamong, and Marino. Prior to July 17, 2013, "Realtors/Staton" never attempted to terminate the relationship with Center.[34] Also prior to July 17, 2013 "Staton had access to [Center's] client information, asset information, and other confidential information."[35]

The Complaint asserts that there was an agreement, apparently orally, among the members of Center "that all loans to [Center] would be accounted for and paid upon closing of the business of [Center], in proportion to each member's interest."[36] The Complaint further alleges that between 2009 and July 2013 Realtors/Staton "made payments on third-party loans" made to Center "in recognition and conformity with" the alleged oral agreement regarding loans.[37] The Complaint,

---

[31] Compl. ¶ 20.
[32] *Id.* at ¶ 21.
[33] *Id.* at ¶ 22 (emphasis added).
[34] *Id.* at ¶ 23.
[35] *Id.* at ¶ 29.
[36] *Id.* at ¶ 25.
[37] *Id.* at ¶ 26.

8

however, is silent as to what particular loans were paid, and whether Realtors/Staton were paying such loans in full in their individual capacity, or in accordance with their current percentage interest in Center.

### 3. The Winding Down of Center

In early 2013 "Kulp, as managing member of [Center], commenced the winding down of [Center]."[38] During the winding down process Kulp informed Staton that Staton owed Kulp "approximately $105,744 in contributions and loans which were made by Kulp" during the period when Staton did not make contributions.[39] In an allegation contrary to the mechanism for automatic dilution provided by the sole written governing document, the 2006 Agreement, the Complaint alleges that up until July 17, 2013 Staton "represented to Kulp that the inequitable balance of *contributions* and loans by members would be settled when the business of [Center] ceased."[40]

Staton notified Kulp that neither he nor Realtors would pay the amount demanded on July 17, 2013.[41] Following the refusal to pay, the Plaintiffs began to investigate Staton's conduct while he was a member of Center.[42] The Complaint alleges the investigation revealed that Staton used Center resources in 2009 to fund

---

[38] *Id.* at ¶ 27.
[39] *Id.*
[40] *Id.* at ¶ 28 (emphasis added).
[41] *Id.* at ¶ 30.
[42] *See id.* at ¶ 31.

advertising for himself while he was associated with Prudential Gallo and that Staton "copied and removed client lists from [Center]" which he used to "foster relationships" to benefit Prudential Gallo, Allamong, and Marino.[43] Further, the investigation allegedly revealed that Staton "copied and removed e-mail lists from [Center]" and used the lists to "communicate with clients, vendors and associates to the benefit of himself, Prudential Gallo, Allamong and Marino."[44]

*C. Procedural History*

This matter has not proceeded with alacrity. The Plaintiffs filed the Complaint on August 5, 2014.[45] The Defendants filed an answer and counterclaim, along with the presently pending Partial Motion to Dismiss on September 8, 2014.[46] The parties briefed the Partial Motion to Dismiss, with the Defendants submitting a reply brief on December 5, 2014.[47] Oral argument on the pending Motion was scheduled for February 24, 2015.[48] However, that argument was removed at the request of the parties and this matter was stayed to facilitate settlement discussions.[49] Those settlement discussions, it appears, proved unsuccessful. The matter was substantively inactive as a series of extensions to the stay were requested and

---

[43] *See id.*
[44] *See id.*
[45] Dkt. No. 1.
[46] Dkt. Nos. 7, 8. The Plaintiffs have answered the counterclaim.
[47] *See* Dkt. No. 21.
[48] *See* Dkt. No. 22.
[49] Dkt. No. 23.

granted.  Ultimately, I wrote the parties on June 20, 2016 asking why the matter should not be dismissed due to inactivity.[50]  This prompted unfortunate and accusatory finger-pointing from each side regarding the source of the delay.[51]

Eventually this case was included in a call of the calendar held on February 27, 2017.  By letter following that hearing the parties indicated that there were no other outstanding issues that required briefing, other than the Partial Motion to Dismiss.  Because the briefing in this matter was completed in December 2014, I offered the parties the opportunity to supplement their submissions, however, the parties did not respond to this offer.  Similarly, I offered the parties the opportunity to present oral argument on the outstanding motion.  No response was received by the Court-imposed deadline so I again wrote the parties on May 26, 2017 informing them I considered the matter submitted, without argument or supplement, as of that date.

---

[50] Dkt. No. 34.

[51] *Compare* Dkt. No. 35 *with* Dkt. No. 36.  *See* Dkt. No. 35 at 3 (indicating in a letter from Plaintiffs' counsel that "[t]his attorney . . . wrongly assumed that Defendant would take the point in preparing a scheduling order . . . . Accordingly, nothing was placed on my calendar regarding same."); Dkt. No. 36 at 5 (stating in a letter from Defendants' counsel that they believed the Plaintiffs would prepare a schedule to move their matter forward, that there was no basis to assume Defendants' would "take the point in preparing a scheduling order," and that "Plaintiffs should be able to manage this litigation without assistance from opposing counsel."); *see also* Dkt. No 36. at 6 ("If Defendants' counsel is guilty of anything, it is not a lack of professionalism—perhaps they are guilty of too much optimism in believing that the massive delays in prosecution were attributable to a good faith interest in settlement, as opposed to seriatim delays to avoid substantive work while keeping the threat of litigation hanging over Defendants' heads.").

The Complaint pleads Six Counts. To avoid confusion on the part of the parties and other readers of this Letter Opinion, and to ameliorate confusion on my part, it is useful to note as follows: The Counts in the Complaint contain several idiosyncrasies in numbering. There are two Counts titled Count V. Oddly, in my experience, there is a Count titled Count IV that *follows* the two Counts titled Count V. In an attempt to avoid confusion, I will refer to the first Count V as "Alias Count IV," the second Count V as "Alias Count V," and the Count following both Counts labeled V as "Alias Count VI." Also unusual, in my experience, is that several of the paragraph numbers are repeated in the Complaint. For example, there are two paragraphs fifty-nine, and two paragraphs sixty, located on different pages of the Complaint, containing different factual allegations. This problem occurs for several other paragraph numbers. This adds a certain frisson of excitement to the jurist to whom Counts and paragraphs are referred in briefing, but like all good things comes at a price; here, clarity. I can think of no simple way to clarify the paragraph numbering in my citations, so the reader will be left to guess, as the Court was in briefing, to which of the repetitively numbered paragraphs I refer.

The Defendants' Motion seeks dismissal of three of the Counts: Count II asserting a breach of fiduciary duty claim, Alias Count V asserting a "breach of implied contract/estoppel" claim and, Alias Count VI asserting a constructive trust

12

claim.[52]  The Defendants have not moved to dismiss Counts I, III and Alias Count IV which assert claims regarding conversion of trade secrets, piercing the corporate veil, and conversion, misappropriation, and restitution of Center's funds, respectively.

## II. ANALYSIS

The standard of review for a motion to dismiss pursuant to a Court of Chancery Rule 12(b)(6) motion is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[53]

Despite the lenient pleading standard, the Court "is not, however, required to accept as true conclusory allegations 'without specific supporting factual allegations.'"[54] Further, "a trial court is required to accept only those 'reasonable inferences that logically flow from the face of the complaint' and 'is not required to accept every strained interpretation of the allegations proposed by the plaintiff.'"[55]  For the reasons discussed below, Defendants' Motion is granted in part.

---

[52] Dkt. No. 8.

[53] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[54] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).

[55] *Id.* (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del.2001)).

13

*A. The Breach of Fiduciary Duty Count*

To recover for a breach of fiduciary duty, a plaintiff must prove two basic elements: that the defendant owed a fiduciary duty and that the defendant breached the duty owed.[56] Thus, to survive a motion to dismiss, this Complaint must sufficiently plead the existence of a fiduciary duty, and a breach of such a duty. Set out in full below are the four paragraphs of the breach of fiduciary duty Count of the Complaint:

- "Plaintiffs repeat and incorporate the foregoing paragraphs."[57]

- "*As a member* of [Center], [Realtors]/Staton *owed* a fiduciary duty of loyalty to [Center]."[58]

- "[Realtors]/Staton engaged in a course of self-dealing using [Center] assets for financial gain of Staton, Prudential Gallo, Allamong and Marino."[59]

- "As a result of the breach of fiduciary duty, [Center] has been damaged."[60]

The Defendants seek dismissal of this Count arguing that the Complaint fails to adequately allege the existence of a fiduciary duty. The Defendants observe that the Plaintiffs have failed to locate a single case holding that minority members of a

---

[56] *See, e.g.*, *ZRii, LLC v. Wellness Acquisition Grp., Inc.*, 2009 WL 2998169, at *11 (Del. Ch. Sept. 21, 2009).
[57] Compl. ¶ 42.
[58] *Id.* at ¶ 43 (emphasis added).
[59] *Id.* at ¶ 44.
[60] *Id.* at ¶ 45.

14

Delaware LLC owe fiduciary duties by default.[61] Delaware LLCs are known for their contractual flexibility; however, our Courts have interpreted the Delaware LLC Act to imply default fiduciary duties to *managers* of a LLC unless such duties are clearly disclaimed.[62] The Plaintiffs concede, as they must, that Kulp exclusively manages and controls Center and that it is well settled that only managing members or controllers owe fiduciary duties by default in LLCs.[63] On the face of the Complaint, minority membership is the sole allegation that purports to create the fiduciary duty.[64] That is insufficient as a matter of law. Thus the pleading that Realtors or Staton owed fiduciary duties to Center falls short.

In briefing, the Plaintiffs attempt to change tack, accusing the Defendants of error for focusing on "default duties" in their opening brief.[65] This focus by the Defendants, however, was warranted given that the pleading of the duty owed *only* refers to membership.[66] The Plaintiffs advance in briefing that the duty owed here instead arises from access to confidential information, an allegation absent from their

---

[61] Defs' Reply Br. 4.

[62] *See, e.g.*, *Kelly v. Blum*, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) ("the Delaware Limited Liability Company Act . . . contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware LLC."); H.B. 126, 147th Gen. Assemb. (Del. 2013).

[63] *See* Pls' Answering Br. 9.

[64] *See* Compl. ¶ 43.

[65] *See* Pls' Answering Br. 9–11.

[66] Compl. ¶ 43. ("As *a member* of [Center], [Realtors]/Staton *owed* a fiduciary duty of loyalty to [Center].").

15

Complaint.[67]  Having responded in 2014 to the Partial Motion to Dismiss, rather than seeking to amend in response, the Plaintiffs are limited to the allegations of the Complaint here.

In any event, even a complaint encompassing the Plaintiffs allegations made in briefing would be insufficient to avoid dismissal.  Courts in our State recognize that "[a] fiduciary relationship is a situation where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part of one person to protect the interest of another."[68]  Conclusory statements that someone or something is "a fiduciary" in a complaint will not suffice—instead there must be an allegation of an agreement supplying such a duty or a special relationship creating such a duty.  Such allegations, to make it reasonably conceivable that a duty is owed, are absent from this Complaint.[69]  While the Defendants may have acted wrongfully in allegedly converting the secrets of Center, an allegation for which the Plaintiffs seek relief at law,[70] that does not create a fiduciary relationship; in fact, in my experience, thieves and their victims rarely consider their relationship equitable on account of that status alone.  Rather, there must be some repose of special trust

---

[67] *See* Pls' Answering Br. 10–11.

[68] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (citations omitted).

[69] I note, in their answering brief, the Plaintiffs point to Count I as supplying the factual allegations creating the fiduciary duty—there is *no* citation to Count II, the breach of fiduciary duty count. *See* Pls' Answering Br. 12–13 (citing Compl. ¶¶ 34, 37, 39).  Count I and the portions referenced in briefing plead a Count seeking statutory relief for conversion of trade secrets.

[70] *See* Compl. Count I.

in the Defendants or reliance on the Defendants, not alleged here. It is conceivable that in certain circumstances a minority member of an LLC, with access to confidential information, could stand in a fiduciary relationship to the entity or other members. Non-conclusory allegations in support of a relationship creating such a duty are lacking on the face of the Complaint here, however.[71] Defendants' Motion is granted with respect to Count II.[72]

*B. The Breach of an Implied Contract/Estoppel Claim*

The Defendants have moved to dismiss Alias Count V of the Complaint. Alias Count V alleges that there was an "*understanding* that each member would be responsible for its/his share of the contributions to the business in amounts equal to its/his share of interest in [Center]."[73] It seeks relief on two independent grounds, implied contract and promissory estoppel. Candidly, I am confused by the pleading and argument surrounding this Count of the Complaint. The Complaint is unclear as to the theory underlying the Count, and, frankly, the Count itself references almost nothing in the way of factual support for the claims asserted;[74] as for the parties'

---

[71] In fact, there are no such allegations, conclusory or otherwise, in Count II, the Count alleging a breach of fiduciary duty. *See id.* at ¶¶ 42–45.

[72] Although this result is compelled by the allegations of the Complaint, I note to the extent Plaintiffs' grievances are about removal of cash or secrets from Center, Counts addressing those issues remain.

[73] *Id.* at ¶ 55 (emphasis added).

[74] *See id.* at ¶¶ 54–54. I note this citation is misleading. Alias Count V actually contains six separate paragraphs. Both the first and last paragraph of Alias Count V are labeled fifty-four, however.

17

briefing, it reprises Arnolds darkling plain where ignorant armies clash by night. I begin with a discussion of the implied contract theory of recovery.

The Defendants argue that the allegations of Alias Count V are at odds with the 2006 Agreement which, to their minds, provides a mechanism for automatic dilution in the event of capital calls, and permitted discretionary loans by Kulp with no reciprocal obligation by the Defendants with regards to loans. According to the Defendants, this implied contract claim is preempted by the express contract providing for automatic dilution in the event of failed capital calls, and silence as to the allocation of liability for loans. Since the agreement is silent as to loans, the Defendants argue the LLC Act defaults control—that members are not personally liable for the debts of the LLC. The Defendants further point out that the Plaintiffs again pad their answering brief to bolster the cursory and missing allegations of the Complaint.

The Plaintiffs argue in briefing that the Defendants wrongly focus on the single written contract—the 2006 Agreement—when the focus instead should be on the alleged oral operating agreement.[75] Under the Plaintiffs' theory of the case, as I understand it, there is an oral operating agreement, along with alleged oral promises and/or understandings regarding responsibility for loans and capital contributions.[76]

---

[75] *See* Pls' Answering Br. 14–15.
[76] *See* Compl. ¶¶ 25, 28, Ex. A.

18

All of these agreements represent an express contract or contracts, although curiously, no count for breach of contract is stated. A contract may be implied under our law where no express contract exists, but the circumstances demonstrate the intent of the parties to be bound nonetheless.[77] Such a pleading is absent from the Complaint. Indeed, the Plaintiffs recognize there is no recovery or cause of action for an implied contract where express agreements exist covering the subject matter.[78] They then argue an express oral contract: "[a]ccording to the operating agreement as plead by Plaintiff [sic], repayment was to occur when [Center] ceased doing business."[79] Simply, the Complaint alleges the existence of an express agreement, and there is a complete absence of facts pled in the Complaint to make an implied contract claim reasonably conceivable.

I turn to an analysis of the promissory estoppel allegation of Alias Count V. As this Court has explained "[u]nder the doctrine of promissory estoppel, a plaintiff must show by clear and convincing evidence that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the

---

[77] *See, e.g.*, *Creditors' Comm. of Essex Builders, Inc. v. Farmers Bank*, 251 A.2d 546, 548 (Del. 1969) ("A contract will be implied in fact only when the Court may fairly infer such an intent from the evidence; it represents the presumed intention of the parties as indicated by their conduct.") (citation omitted).

[78] *See* Pls' Answering Br. 15.

[79] *Id.* at 15–16 (citing Compl. ¶¶ 25, 28 for the proposition that the alleged repayments were pled in the Complaint "as a part of the operating agreement of the parties"). Paragraph 25 of the Complaint pleads an affirmative agreement that loans would be paid upon a wind-down according to members' proportional interest. *See* Compl. ¶ 25; *see also id.* at ¶ 28; *id.* at Ex. A at 1.

part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise."[80] Further the "the alleged promise must be a real promise, not just mere expressions of expectation, opinion, or assumption, and reasonably definite and certain."[81] Thus at the motion to dismiss stage, a plaintiff must plead facts making it reasonably conceivable that they could establish each required element upon a developed record.

Here, the Defendants are correct that Alias Count V is a deficient pleading. However, reading the Complaint as a whole, and such that all reasonable inferences go in favor of the Plaintiffs, I find a promissory estoppel claim adequately alleged. The Complaint alleges that Staton promised to repay any loans made by Kulp to Center, upon dissolution of the LLC. This reasonably implies that the promise was made to encourage such loans. In reliance, Kulp made additional loans, which are not now recoverable from the LLC.[82] He seeks recovery from Staton. This is sufficient to state a claim for promissory estoppel, and Defendants' Motion to Dismiss Alias Count V is denied with respect to that theory.

---

[80] *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, 2014 WL 5025926, at *21 (Del. Ch. Sept. 30, 2014) (internal quotations omitted).

[81] *Id.* (internal quotations omitted).

[82] I note that reliance is actually plead in Alias Count VI, rather than in Alias Count V. *See* Compl. ¶ 58.

## C. The Constructive Trust Claim

Through Alias Count VI of the Complaint the Plaintiffs seek a constructive trust. A constructive trust is a remedial measure and is targeted at redressing a wrong.[83] A constructive trust will be imposed "[w]hen one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another *to whom he or she owes some duty . . . .*"[84] To impose a constructive trust, "[s]ome fraudulent or unfair and unconscionable conduct is essential."[85] Additionally, a constructive trust is only an available remedy in specific situations. That is, the trust will only be imposed over specific property, identifiable proceeds of specific property, and money if it resides in an identifiable fund "to which plaintiff claims equitable ownership."[86] In the Complaint the Plaintiffs seek the remedy of a constructive trust over money in the amount of $105,744 arising from Staton's failure to make capital contributions and repay loans.[87] However, in their answering brief the Plaintiffs make no mention of that claim and instead solely pursue a constructive trust theory regarding sale commissions from the alleged improper use of client lists.[88] I therefore consider the particular constructive trust theory, as pled, waived. To the extent the Plaintiffs seek to pursue a constructive trust theory over

---

[83] *See Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993).
[84] *Id.* (citations omitted) (emphasis added).
[85] *Id.* (citation omitted).
[86] *Id.* (citation omitted).
[87] Compl. ¶ 60.
[88] Pls' Answering Br. 20.

commissions on sales generated by the allegedly purloined client list, such a claim is (1) untenable as a matter of trust theory and (2) subsumed within a claim at law—the trade secrets claim not subject to this Motion to Dismiss—and thus unavailable in equity. Accordingly, Alias Count VI is dismissed.

### III. CONCLUSION

For the foregoing reasons the Partial Motion to Dismiss is granted in part and denied in part. To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED. To the extent an Order is appropriate to dismiss individual Defendants from this action based on this Letter Opinion, the parties should supply a form of order. The Plaintiffs should move within two weeks to amend the Complaint to remove the numbering errors that would make intelligible discussion of the issues in a post-trial decision difficult.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III