# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LYONS INSURANCE AGENCY, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0092-SG |
| | ) | |
| | ) | |
| HOWARD WILSON and GMG | ) | |
| INSURANCE AGENCY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  June 11, 2018
Date Decided:  September 28, 2018

Michael P. Kelly, Andrew S. Dupre, and Janine L. Faben, of MCCARTER & ENGLISH, LLP, Wilmington, Delaware, *Attorneys for Plaintiff*.

Herbert W. Mondros and Krista Reale Samis, of MARGOLIS EDELSTEIN, Wilmington, Delaware; OF COUNSEL: Christopher A. Tinari and Michael R. Miller, of MARGOLIS EDELSTEIN, Philadelphia, Pennsylvania, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

Madness, Einstein is famously (but apparently inaccurately) credited with saying, is illustrated by doing the same thing repeatedly while expecting different results. The individual defendant here, Howard Wilson, was in 2014 an employee of an insurance brokerage firm, USI Insurance Services ("USI"). Wilson left the employ of USI in July of that year, to work for another brokerage, the Plaintiff here, Lyons Insurance Agency, Inc. ("Lyons"). He brought with him his "book of business;" that is, his relationship with customers who had entrusted him with their insurance business. In fact, many of these customers left USI to become clients of Lyons. Wilson, however, was bound by a non-competition agreement with USI. USI sued Wilson and Lyons in Pennsylvania state court, and obtained an injunction preventing Lyons and Wilson from providing insurance brokerage to the entities in Wilson's book of business. Lyons was forced to discharge those entities as customers. Nonetheless, and despite the fact that without the book of business, Wilson provided little value to Lyons, Lyons kept Wilson on the payroll during the two-year period of the injunction. Part of Wilson's job was to keep in contact with the entities in the book of business, whom Lyons regarded as prospective customers once the injunction lifted. At the end of two years, Lyons bought out the book of business from USI, terminating the injunction. Lyons paid USI approximately one

half million dollars, with the anticipation that Wilson could then encourage the return of the book entities to the Lyons fold.

Wilson, however, doubted his ability to retrieve his former customers, some of whom had engaged another brokerage, GMG Insurance Agency ("GMG"), at Wilson's suggestion during the pendency of the injunction. Instead of working to entice the customers to return to Wilson at Lyons, Wilson took an easier path: He joined GMG and began servicing some of the customers in his book of business there. Wilson, however, has a non-compete provision in his Employment Agreement with Lyons. Lyons sued Wilson and GMG, seeking preliminary injunctive relief. I denied the preliminary injunction, noting what serves as a liquidated damages clause in the Employment Agreement as preclusive of a preliminary finding of irreparable harm. Both sides have filed cross-motions for summary judgement, which I find must be granted in part and denied in part. It is clear, however, that Wilson has breached his non-competition agreement with Lyons, as he had a similar provision in his agreement with USI. What remain are primarily issues relating to remedy, which I find require a more complete record. My reasoning follows.

## I. BACKGROUND

*A. The Parties*

Plaintiff Lyons is an insurance broker that serves clients in Delaware, Pennsylvania, and elsewhere.[1]  Lyons is a Delaware corporation with a principal place of business in Wilmington, Delaware.[2]

Defendant Howard Wilson worked for Lyons from July 2014 to August 2016.[3] He executed a Confidentiality, Non-Solicitation, and Continuing Compensation Agreement (the "Employment Agreement") with Lyons on July 23, 2014.[4]  He left Lyons on August 12, 2016.[5]

Defendant GMG is an insurance broker that serves clients in Delaware, Pennsylvania, and elsewhere.[6]  Its principal place of business is Bucks County, Pennsylvania.[7]  Wilson began working at GMG on August 15, 2016, after leaving Lyons.[8]

---

[1] June 14, 2017 Hr'g Tr. at 9:10–20, 15:17.
[2] Compl. ¶ 4.
[3] June 14, 2017 Hr'g Pl. Ex. 2; June 14, 2017 Hr'g Tr. at 50:9–12.
[4] June 14, 2017 Hr'g Pl. Ex. 2, Confidentiality, Non-Soliciation, and Continuing Compensation Agreement [hereinafter, "Employment Agreement"].
[5] June 14, 2017 Hr'g Tr. at 50:9–12.
[6] *Id.* at 16:1–8, 139:1–5.
[7] *Id.* at 47:9–11.
[8] *Id.* at 136:8.

*B. Factual Background*

### 1. Wilson joins Lyons

Prior to joining Lyons, Wilson worked as an insurance professional at USI.[9] Because the insurance business is based on personal relationships, insurance professionals such as Lyons are said to have a book of business, which consists of the client and prospective relationships that an insurance professional has made.[10] In July 2014, Wilson left USI to join Lyons, with the intention of bringing his book of business from USI.[11] Prior billings and experience indicated that the annual revenue of Wilson's book of business was over $500,000.[12] Lyons extended an offer of employment to Wilson on July 14, 2014;[13] Wilson accepted and signed the offer and the Employment Agreement on July 23, 2014.[14] The Employment Agreement defines Wilson's book of business (the "Book of Business") as "the customer relationships for which Employee is compensated during the term of his employment."[15] The same provision stipulates that the Book of Business is the property of Lyons, not Wilson.[16]

---

[9] June 14, 2017 Hr'g Tr. at 28:1–12.
[10] *Id.* at 19:6–10.
[11] *Id.* at 106:9–20.
[12] *Id*. at 30:3–7.
[13] June 14, 2017 Hr'g, Pl. Ex. 1.
[14] June 14, 2017 Hr'g, Pl. Ex. 2, Employment Agreement.
[15] *Id.* § 4.1.
[16] *Id.*

Approximately three-quarters of the clients in Wilson's Book of Business followed him from USI to Lyons.[17]  Shortly thereafter, USI sued Wilson and Lyons in Pennsylvania state court, alleging breach of a non-competition agreement between Wilson and USI (the "USI litigation").[18]  Lyons had been aware of that non-competition agreement when it hired Wilson.[19]  Although in the insurance brokerage industry an employer will often purchase a new employee's Book of Business from her previous employer, USI would not agree to a buyout and instead sought an injunction.[20]

The Pennsylvania court issued a preliminary injunction on August 8, 2014 (the "USI injunction").[21]  As a result, neither Wilson nor Lyons could service Wilson's USI clients.[22]  The clients who had followed Wilson to Lyons were dispersed among other brokers, and Lyons encouraged Wilson to help them select new brokers.[23]  At Wilson's suggestion, some of his former clients went to GMG.[24] Lyons paid for all of Wilson's expenses in the USI litigation.[25]

---

[17] June 14, 2017 Hr'g Tr. at 30:19–20, 31:23–32:4.
[18] *Id.* at 32:24–33:3.
[19] *Id*. at 106:21–22.
[20] *Id*. at 31:4–7.
[21] June 14, 2017 Hr'g, Pl. Ex. 3.
[22] June 14, 2017 Hr'g Tr. at 96:12–22.
[23] *Id.* at 35:13–15, 36:11–14.
[24] *Id.* at 94:5–7, 116:21.
[25] *Id.* at 40:16–22.

5

## 2. Wilson's Employment at Lyons

In the two-year period that Wilson was employed at Lyons and the USI injunction was in place, Lyons paid Wilson an annual salary of $205,000, a $50,000 signing bonus, life, health, and disability insurance, and contributions to a 401(k) plan.[26] This salary was based, at least in part, on the value of the Book of Business that Wilson was supposed to have brought from USI to Lyons, but which was subject to the two-year USI injunction.[27] Lyons did not increase Wilson's salary after his first year at Lyons, as was contemplated (but not required) by Wilson's Employment Agreement.[28]

While employed with Lyons, Wilson continued to contact and to meet with his former clients to the extent that the USI injunction would allow.[29] Maintaining those relationships was part of his employment duties.[30] Wilson was also expected to cultivate relationships with "prospects" in order to bring new business to the firm.[31] Prospects, as the name suggests, are potential clients with whom insurance brokers build relationships in the hopes of gaining new business.[32] Lyons paid for

---

[26] *Id.* at 40:12–15; June 14, 2014 Hr'g, Pl. Ex. 1.

[27] June 14, 2017 Hr'g Tr. at 40:5–22.

[28] *Id.* at 77:17–78:5; June 14, 2017 Hr'g, Pl. Ex. 1 ("On your one year employment anniversary . . . and pending approval from your manager and the CEO, David Lyons, Sr., your annual salary will increase to $230,000.").

[29] June 14, 2017 Hr'g Tr. at 37:15–23.

[30] *Id.*

[31] *Id.* at 37:8–14.

[32] *Id.* at 13:9–24.

Wilson to attend meetings in Las Vegas, the Bahamas, and elsewhere, in order to maintain contact with his former clients and his prospects.[33] Contrary to Lyons' and Wilson's prior expectations, Wilson generated no income from his Book of Business because of the USI injunction.[34] Furthermore, he generated only $30,000 to $40,000 in new business during his employment with Lyons.[35]

### 3. Wilson Leaves Lyons

On July 18, 2016, Lyons paid USI $525,000 to settle the USI litigation.[36] Consequently, the USI injunction was lifted and its non-competition requirements ended.[37] Wilson contacted the largest client in his Book of Business, OTG Management, Inc. ("OTG"), which was then serviced by GMG, to gauge OTG's interest in moving from GMG to Lyons.[38] OTG informed Wilson that it would not move its business at that time.[39] At that point, Wilson felt as though his "career was in balance."[40] Wilson took a vacation in July 2016.[41] Thereafter, Wilson resigned

---

[33] *Id.* at 39:7–11, 102:7–13.
[34] *Id.* at 52:3–16.
[35] *Id.* at 78:19–24, 81:20–23.
[36] *Id.* at 40:16–22.
[37] *Id.* at 159:6–11.
[38] *Id.* at 163:13–17.
[39] *Id.*
[40] *Id.* at 164:10–11.
[41] *Id*. at 44:24–45:1, 161:7–9.

from Lyons effective on August 12, 2016.[42]  He began employment with GMG on August 15, 2016.[43]

As part of his employment at GMG, Wilson serviced clients that were previously part of his Book of Business when he moved from USI to Lyons, but which were serviced by GMG following the USI injunction.[44]  OTG was one such moved client.[45]  The annual revenue of the moved clients was approximately $500,000.[46]

After he began working for GMG, Wilson contacted several of Lyons' existing clients using his GMG email address.[47]  These were clients whose business Wilson had generated while employed at Lyons.[48]  When contacting one such Lyons client, CODi, Wilson asked his contact at CODi to send him a copy of CODi's policy with Lyons.[49]  Also, on October 4, 2016, Wilson circulated a spreadsheet to his GMG colleagues detailing Lyons business that Wilson hoped to move to GMG.[50]  On December 21, 2016, Wilson met with a Lyons representative.[51]  At that meeting, Wilson asked if Lyons would be willing to enter into an agreement that would allow

---

[42] *Id.* at 46:1–2, 162:5–9.
[43] *Id.* at 136:7–8, 162:8–9.
[44] *Id.* at 162:10–163:9.
[45] *Id.*
[46] *Id.* at 29:16–30:7, 151:3–8.
[47] *Id.* at 53:11–55:10.
[48] *Id.* at 67:14–17.
[49] June 14, 2017 Hr'g, Pl. Ex. 8.
[50] June 14, 2017 Hr'g, Pl. Ex. 10.
[51] June 14, 2017 Hr'g Tr. at 68:11–19.

Wilson and GMG to buy out the Lyons clients that Wilson had previously serviced.[52]

Lyons declined, and those clients remained with Lyons.[53]

### 4. The Employment Agreement

When Lyons hired Wilson in July 2014, he signed the Employment Agreement that is at the heart of this dispute.[54] In entering the Employment Agreement, Wilson acknowledged that Lyons is engaged in a competitive industry, that Wilson would have access to proprietary and confidential information, that Wilson must keep that information in strict confidence, and that Lyons would be financially harmed if Wilson subsequently became employed by one of Lyons' competitors.[55]

The Employment Agreement contained a confidentiality provision that applied to Lyons' proprietary and confidential information, including customer and prospect identities and contact information, terms of customer and supplier contracts and proposals, and pricing policies.[56] Under the confidentiality provisions,

> [a]t all times during and after Employee's employment with Lyons, Employee will not disclose or communicate any of the Proprietary Information to any competitor or other third party, or use or refer to any of the Proprietary Information for any purpose. . . . Employee understands that these provisions apply even to information of this type

---

[52] *Id.*
[53] *Id.* at 69:8–10.
[54] June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement.
[55] *Id.* §§ 1.3–1.8.
[56] *Id.* §§ 2.1–2.3.

9

that is developed or conceived by Employee, alone or with others, at Lyons's instruction or otherwise.[57]

The Employment Agreement also prohibited Wilson from engaging in competitive behavior. It defined competitive behavior as, among other things, "engaging in activity . . . that is competitive with any business conducted by Lyons at the time of [Wilson's] termination of employment or any business that Lyons proposed to be conducted during [Wilson's] employment with Lyons, or engaging in an activity that would be a violation of Section 4.3," the Employment Agreement's Non-Solicitation and Non-Hire Provision.[58] Section 4.3, in turn, prohibited Wilson from "impair[ing] or attempt[ing] to impair any relationship, whether contractual or otherwise, between the Company or any of the Company's subsidiaries and any other person or entity (including, without limitation, customers, prospective customers, and suppliers)."[59] This provision would remain in effect for two years after termination of Wilson's employment with Lyons.[60]

I surmise, based on this record, that insurance brokerages monetize their client services through receipt of commissions based on insurance premia paid by clients to insurance carriers.[61] The Employment Agreement contained a buyout provision

---

[57] *Id.* § 2.
[58] *Id.* § 3.3.2.
[59] *Id.* § 4.3(iii).
[60] *Id.* § 4.3.
[61] *See, e.g.*, June 14, 2017 Hr'g Tr. at 11:2–7, 13:13–14.

that would take effect if Wilson left Lyons to work for a competitor and took some of his Book of Business with him.[62] This would be deemed "Moved Business," which the Employment Agreement defined as "the annualized amount of commissions generated by the portion of the Book of Business moved to Employee's new employer . . . at the time such portion of the Book of Business is moved to Employee's new employer."[63] In the case of moved business, Wilson was to pay Lyons "an amount equal to 1.5 times the Moved Business."[64] This provision would apply for two years after Wilson's employment with Lyons terminated.[65]

*C. This Litigation*

Lyons filed this action on February 7, 2017. Count I of Lyons' complaint seeks to hold Wilson liable for breach of contract. It alleges that Wilson engaged in competitive behavior, that he serviced his Book of Business at GMG, that he used Lyons' confidential information, and that he failed to pay the "purchase price" for the Book of Business, all in breach of the Employment Agreement.[66] Count II alleges that by his actions, Wilson breached the covenant of good faith and fair dealing.[67] In Count III, Lyons seeks what it denominates "quantum meruit" relief from Defendant Wilson in the amount of $525,000, the cost Lyons bore from the

---

[62] June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 4.1.
[63] *Id.* § 3.3.5.
[64] *Id.* § 4.1
[65] *Id.*
[66] Compl. ¶¶ 54–61.
[67] *Id.* ¶¶ 63–68.

11

USI litigation.[68]   Count IV seeks to hold Defendant GMG liable for aiding and abetting Wilson's breach of the Employment Agreement.[69]   Count V seeks to hold the Defendants liable for unjust enrichment regarding the moved clients,[70] while Count VI seeks to hold the Defendants liable for civil conspiracy to deprive Lyons of its relationships with the moved clients.[71]   Finally, Count VII seeks to hold Defendant GMG liable for tortious interference with contract and prospective economic relations, caused by GMG's alleged interference in the Employment Agreement that existed between Wilson and Lyons.[72]   The Defendants' counterclaim seeks to hold Lyons liable for tortious interference with prospective contractual relations, which is allegedly the result of Lyons' filing the present suit.[73]

I granted Lyons' Motion to Expedite on February 28, 2017.  On July 12, 2017, I denied Lyons' Motion for a Preliminary Injunction.  On August 8, 2017, Lyons moved for Summary Judgment on all counts.[74]  I granted the Defendants' Motion to Allow Discovery on October 11, 2017, and I granted the Defendants' Motion for a Protective Order and to Quash Subpoena on December 14, 2017.   After the completion of discovery, on February 23, 2018, Lyons filed a Renewed Motion for

---

[68] *Id.* ¶¶ 69–72.
[69] *Id.* ¶¶ 73–77.
[70] *Id.* ¶¶ 78–83.
[71] *Id.* ¶¶ 84–89.
[72] *Id.* ¶¶ 90–94.
[73] Defs. Answer ¶¶ 1–14.
[74] Pl. Mot. for Summ. J. at 33.

Summary Judgment on Counts I, II, and VII.[75]  Also on February 23, 2018, the Defendants filed a cross-Motion for Summary Judgment on all counts.[76]  I heard oral argument on these Motions on June 11, 2018, at which time the parties agreed that there were no genuine issues of material fact.[77]

## II. ANALYSIS

Under Court of Chancery Rule 56, summary judgment will be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[78]  The moving party bears the initial burden of demonstrating the "absence of a material factual dispute."[79]  If the moving party makes this initial showing, "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial."[80]  In reviewing a summary judgment motion, the Court "must view the evidence in the light most favorable to the non-moving party."[81]  Thus, the Court must deny a request for summary judgment "if there is any reasonable hypothesis by which the opposing

---

[75] Pl. Renewed Mot. for Summ. J. at 37.
[76] Defs. Mot. for Summ. J. at 39.
[77] June 11, 2018 Oral Arg. Tr. at 3:13–17, 24:19–20.
[78] Ct. Ch. R. 56(c).
[79] *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (quoting *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del. Ch. 2007)).
[80] *Id.*
[81] *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992).

13

party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom."[82]

Where, as here, the parties have filed cross-motions for summary judgment and have not argued that a material issue of fact exists, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[83] Nevertheless, "even when presented with cross-motions for summary judgment, a court must deny summary judgment if a material factual dispute exists."[84]

*A. The Employment Agreement is Enforceable*

The Defendants contend that the Employment Agreement is overbroad and therefore unenforceable. Under Delaware law, a covenant not to compete must: (1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable.[85]

This Court has previously held that it "may, in the appropriate circumstances, enforce an agreement without express territorial scope."[86] This is particularly true

---

[82] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).
[83] Ct. Ch. R. 56(h).
[84] *Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1119 (Del. Ch. 2008).
[85] *Concord Steel, Inc. v. Wilm. Steel Processing Co., Inc.*, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008).
[86] *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *12 (Del. Ch. Oct. 23, 2002).

when an employer's non-compete agreement prohibits an employee from engaging in activity that is "in competition with" the employer's business, as opposed to prohibiting activity that is "similar to" that business.[87] Under this Court's precedent, non-compete agreements that prohibit conduct that is "in competition with" the employer's business or that prohibit soliciting the employer's clients "inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete, even if no geographic limitation is expressly set forth in the agreement."[88]

The Defendants posit that the Employment Agreement is unenforceable because, although it has a temporal limitation of two years, it has no specific geographic limitation.[89] That is incorrect. The Employment Agreement at issue in this case prohibits Wilson from impairing Lyons' relationships with any of its customers or prospective customers. It uses language that bars competition: it prohibits Wilson from engaging in "activity that is *competitive with* any business conducted by Lyons at the time of [Wilson's] termination of employment."[90] This is not a blanket prohibition on Wilson working elsewhere; rather, it protects Lyons'

---

[87] *Id.* at *13; *see also All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004) *aff'd*, 880 A.2d 1047 (Del. 2005).
[88] *Del. Exp. Shuttle*, 2002 WL 31458243, at *12.
[89] Def. Mot. for Summ. J. at 21–22.
[90] June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 3.3.2 (emphasis added).

legitimate economic interests.[91] Such a restriction is enforceable under Delaware law.[92]

### B. Lyons' Claims

Lyons' complaint contained various allegations against Wilson, against GMG, and against the Defendants together, all of which relate to GMG's hiring Wilson on August 15, 2016, and the Defendants' subsequent conduct. I will discuss these claims in turn.

#### 1. Wilson's Breach of the Employment Agreement

Lyons alleges that Wilson breached the Employment Agreement when he quit Lyons and joined GMG.[93] Specifically, Wilson purportedly breached the agreement by working for GMG and servicing Lyons prospects at GMG, by failing to pay the purchase price for his Book of Business when he left Lyons for GMG, and by using Lyons' confidential information.[94]

To succeed on its breach of contract claim, Lyons must show that there was a valid contract, breach of an obligation imposed by that contract, and resulting

---

[91] *Compare Res. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) (upholding a non-compete agreement that prohibited an employee from engaging in activity that "competes with" the employer's business) *with Caras v. Am. Original Corp.*, 1987 WL 15553, at *1–2 (Del. Ch. July 31, 1987) (a non-compete agreement that prohibited an employee from engaging in activity "similar to the employer's business" was not valid).

[92] *See Del. Exp. Shuttle*, 2002 WL 31458243, at *12–13.

[93] Pl. Renewed Mot. for Summ. J. at 20–32.

[94] Compl. ¶ 57.

damages.[95]  As I have discussed, the Employment Agreement between Lyons and Wilson is valid and enforceable.  Thus, the next question is whether there was a breach of obligations imposed by that Agreement.  To answer this question, I look to the terms of the Employment Agreement.[96]

### a. Competitive Behavior

Section 3.3.2 of the Employment Agreement prohibits Wilson from engaging in "Competitive Behavior."[97]  This includes working for a company that engages in business that is competitive with Lyons' business within two years of leaving Lyons, as well as attempting to "impair any relationship, contractual or otherwise," between Lyons and its customers or prospective customers.[98]  The prohibition on competitive activity continues for two years after an employee leaves Lyons, and the prohibition on interfering with Lyons' customer and prospective customer relationships has no specified end date.[99]

"Prospective customer" is not defined in the contract.[100]  The parties have somewhat different interpretations; they agree that this term, at minimum, refers to the companies whose business Lyons is actively soliciting; thus, it is broader than a

---

[95] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).
[96] *See Ostroff v. Quality Serv. Labs, Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007) ("A contract's express terms provide the starting point in approaching a contract dispute.").
[97] June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 3.3.2.
[98] *Id.* §§ 3.3.2, 4.3.
[99] *Id.*
[100] *See generally* June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement.

17

broker's actual clients.[101] Still, the parties disagree about which companies should be considered Lyons' prospective customers at the time Wilson left Lyons.[102]

I find that Wilson breached the obligations imposed by the Employment Agreement. Lyons hired Wilson with the expectation that he would bring some of his Book of Business from USI to Lyons, which in fact would have occurred absent the USI injunction. Lyons paid Wilson's salary for two years while the injunction was in place, and it paid all of Wilson's legal fees associated with the USI injunction, to protect its interest in Wilson's Book of Business. Promptly after Lyons bought the Book of Business from USI and the injunction lifted, Wilson quit Lyons. He immediately began working for GMG, where he serviced clients who were in his Book of Business, without compensating Lyons for its interest in the Book of Business—an interest demonstrated by Lyons' investment in the Book of Business throughout the previous two years.

While it is true that Wilson's Book of Business dispersed to other brokers during the USI injunction, Wilson did not make a sincere effort to encourage that business to join Lyons' clientele after the injunction lifted, nor did he make a sincere effort to achieve any return on Lyons' investment in the Book of Business. Although at the moment the USI injunction lifted, none of the Book of Business was a Lyons

---

[101] June 14, 2017 Hr'g Tr. at 13:9–14, 166:16–21.
[102] *See, e.g.*, *id.* at 77:1–6, 132:11–17, 163:22–24.

18

customer, Wilson agrees that the companies in his Book of Business were Lyons prospects after the injunction lifted on July 18, 2016.[103] The Defendants apparently contend that although these companies were Lyons' prospects on July 18, 2016, they ceased to be Lyons' prospects less than a month later when Wilson joined GMG. They point to the fact that the largest client in the Book of Business told Wilson it would not move from GMG to Lyons *at that time*.[104] The Defendants' theory as to how this negates the entire Book of Business's status as prospects remains unclear to me.

Accordingly, the Book of Business entities must be considered prospective customers of Lyons as of August 12, 2016, the date Wilson left Lyons.[105] By servicing his Book of Business at GMG, Wilson helped ensure that none of those clients would move to Lyons. As such, he impaired Lyons' relationships with its prospective customers, in breach of the Employment Agreement.[106]

---

[103] *Id.* at 160:12–22.

[104] *See id.* at 164:13–14 (an OTG representative told Wilson, "I'm not leaving in the middle of my policy period").

[105] *Id.* at 162:5–9. I need not address the counterfactual scenario where Wilson made a rigorous effort to return his Book of Business to Lyons, yet failed. That is not what happened here; Wilson made no such effort, and instead left Lyons mere weeks after the USI injunction lifted.

[106] Lyons posits that even if Wilson did not breach the Employment Agreement, his servicing the Book of Business at GMG constitutes a breach in the implied covenant of good faith and fair dealing. Pl. Renewed Mot. for Summ. J. at 30–32. Because I find that Wilson breached the Employment Agreement, I need not address Lyons' alternative argument.

19

### b. Lyons' Confidential Information

Section 2 of the Employment Agreement is titled "Confidentiality."[107] It states that "at the outset of and during [Wilson's] employment with Lyons, Lyons will provide and teach [Wilson], and [Wilson] will have access to . . . information that is proprietary and confidential to Lyons."[108] It prohibits Wilson from using or referring to any such confidential information "for any purpose," unless in furtherance of his employment with Lyons.[109] Lyons posits that Wilson breached this provision by using Lyons' confidential information to "capitalize" on Wilson's relationships with Lyons' customers and prospective customers.[110] Specifically, breach occurred when Wilson emailed Lyons' customer, CODi, to inquire about its policy with Lyons, and when he shared names of Lyons' clients with GMG as potential GMG prospects.[111]

I find that Wilson did not breach the Employment Agreement with respect to Lyons' confidential information. First, Wilson did not breach the Employment Agreement by accessing Lyons' customer identities, because that information is, put simply, not confidential or proprietary. The record indicates that the insurance brokerage industry is small and competitive.[112] I find that the various brokers' client

---

[107] June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 2.
[108] *Id.* § 1(5).
[109] *Id.* § 2.
[110] Pl. Renewed Mot. for Summ. J. at 21–22.
[111] June 14, 2017 Hr'g Tr. at 53:11–54:16, 146:22–24; June 14, 2017 Hr'g, Pl. Ex. 8.
[112] *Id.* at 11:2–7; 13:13–14.

lists (as distinguished from proposals, policies, and other similar, confidential information) are common knowledge in the industry.[113] Thus, because customer identities are available not just to Lyons employees, but also to outsiders, Wilson could not have breached the confidentiality provision of the Employment Agreement by using Lyons' customer identities for GMG's benefit.

Wilson also did not breach the Employment Agreement as it relates to the terms of customer contracts because he did not use any of Lyons' confidential information. The language of the Employment Agreement only prohibits Wilson from using confidential information that he acquired within the scope of his employment with Lyons. While Wilson likely had access to policy information for CODi and other Lyons clients during his employment at Lyons, Wilson did not take that information with him to GMG. Instead, after he was employed with GMG, Wilson emailed Lyons' client (or clients)—using his GMG email address—and asked those clients to provide him with their Lyons policy information.[114] The contract between Lyons and Wilson does not (and cannot) prohibit clients from disclosing their own policy information to Lyons' competitors. Therefore, Wilson

---

[113] *Id.* at 12:1–18. The record in this case contains abundant evidence to this point. In the insurance brokerage industry, clients fluidly move from one broker to another. An astute employee will monitor these changes, so that information can be used to convert prospective clients into clients.
[114] June 14, 2017 Hr'g Pl. Ex. 8.

did not breach the Employment Agreement with respect to Lyons' confidential information.

### 2. Aiding and Abetting

It is well established that "Delaware law does not recognize the concept of aiding and abetting a breach of contract."[115]  For that reason, Lyons' claim that GMG aided and abetted Wilson's breach of the Employment Agreement must be denied. The Defendants' Motion for Summary Judgment is granted on this count.

### 3. Tortious Interference

Tortious interference requires Lyons to show the existence of (1) a contract, (2) about which the particular defendant knew, (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, and (5) which causes injury.[116]

Lyons alleges that GMG tortiously interfered with the Employment Agreement between Lyons and Wilson.[117]  As I have already explained, the Employment Agreement is a valid contract, and Wilson is in breach.  However, the factual record is not sufficiently developed as to whether GMG's actions satisfy the remainder of the tortious interference requirements.  Accordingly, summary judgment on the tortious interference claim is denied.  The claim remains.

---

[115] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 658 (Del. Ch. 2012) (citing *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002)).
[116] *WaveDivision Hldgs, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).
[117] Pl. Renewed Mot. for Summ. J. at 32–34.

4. <u>Unjust Enrichment</u>

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience."[118]  To recover on a claim for unjust enrichment, a plaintiff must demonstrate: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[119]  Nevertheless, when "a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied."[120]

A contract comprehensively governs the dispute between Lyons and Wilson. As such, Wilson's Motion for Summary Judgment on the unjust enrichment count must be granted.  As to the dispute between Lyons and GMG, Lyons did not argue that GMG was unjustly enriched in either its Renewed Motion for Summary Judgment or in its Answer to the Defendants' Motion for Summary Judgment, nor did it address unjust enrichment at oral argument.[121]  I consider issues not so

[118] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988).
[119] *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.3d 377, 393–94 (Del. Ch. 1999) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998)).
[120] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).
[121] *See generally* Pl. Renewed Mot. for Summ. J.; Pl. Answering Br. in Opp'n to Def. Mot. for Summ. J.; June 11, 2018 Hr'g Tr.

addressed to be waived.[122]  For these reasons, the Defendants' Motion regarding the unjust enrichment claim must be granted.

### 5. Civil Conspiracy

Civil conspiracy requires Lyons to show (1) a confederation or combination of two or more persons, (2) an unlawful act done in furtherance of the conspiracy, and (3) that the conspirators caused actual damage to the plaintiff.[123]  Lyons did not address civil conspiracy in its Renewed Motion for Summary Judgment, nor did it discuss civil conspiracy in its Answering Brief in Opposition to the Defendants' Motion for Summary Judgment.  Lyons' claim is therefore waived.  As such, as to this claim, the Defendants' Motion for Summary Judgment is granted.

*C. Remedy*

Having found that Wilson breached the Employment Agreement, potentially with the tortious assistance of GMG, the question of the appropriate remedy remains. The parties have touched on the issue of damages, but it remains unclear to me what damages should be awarded under the unusual facts of this case, absent further development of the record.  Lyons originally sought injunctive relief. Following the hearing on Lyons' request for a preliminary injunction, however, I found that the

---

[122] *See In re Crimson Exploration S'holder Litig.*, 2014 WL 5447419, at *26 (Del. Ch. Oct. 24, 2014) (waiving the plaintiffs' claim where they "did not mention [the claim] in their Opposition Brief or at the Argument") (citing *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003)).

[123] *Allied Capital Mgmt. Corp. v. GC-Sun Holdings, L.P.*, 910 A.3d 1020, 1036 (Del. 2006).

24

"buyout" provision of the Employment Agreement—discussed below—functioned as a liquidated damages clause, and prevented a finding of threatened irreparable harm, and thus injunctive relief, at that stage of the proceedings. That was a preliminary ruling, however, and a final injunction remains a viable remedy to the extent the facts warrant.

In the Employment Agreement, the parties agreed that Lyons would be financially harmed if Wilson became employed with a competitor.[124] Additionally, the Employment Agreement contains a "Purchase of Book" buyout provision, referenced above, that functions as a liquidated damages agreement. That provision states that if Wilson becomes employed with a competitor, and some or all of the Book of Business moves to the competitor "as a result" of the change in employment, he will owe Lyons 1.5 times the annual revenue of any "moved business."[125] Several clients, such as OTG, did move from Lyons to GMG; however, those clients moved as a result of the USI injunction, together with Wilson's advice to so move, given during his employment with, and at the behest of, Lyons. The record is unclear as to how the parties intended the buyout provision to work in this scenario. I note that the breach here is Wilson's anti-contractual competition through soliciting and servicing "prospective" Lyons clients from the Book of Business. The list

---

[124] June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 1.8.
[125] *Id.* § 4.1.

comprising prospective clients is broader than the "moved clients" defined in the buyout, under the peculiar scenario here. I find that Lyons has suffered compensable damages as a result of the breach, but on this record I remain uncertain of the quantum of damages compensable and how that amount is guided or cabined by the buyout provision. If damages are not ascertainable, injunctive relief, for a period tolled by this action, remains a potential remedy.

The parties should confer regarding the appropriate remedy. By October 22, 2018, the parties should inform me whether they have been able to reach an agreement, or whether further Court involvement is needed and what that involvement might entail.

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and the Defendants' Motion for Summary Judgment is granted in part and denied in part. The parties should submit an appropriate form of order.